IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CLAUDE GRANT, ORALENE DAY, | ) | |
| PRINCESS MARTINDALE, | ) | NO. 3 04 0630 |
| FALETHA REID, DARRYL MCKIBBENS, | ) | |
| DARREL GANT, ANTONIO MCKISSACK, | ) | JUDGE HAYNES |
| PAMELA TUCKER and | ) | |
| SANDRA DERRICK, | ) | MAGISTRATE JUDGE BROWN |
| individually and on behalf | ) | |
| of all others similarly situated, | ) | CLASS ACTION COMPLAINT |
| | ) | |
| Plaintiffs, | ) | JURY DEMAND |
| | ) | |
| v. | ) | |
| | ) | |
| METROPOLITAN GOVERNMENT OF | ) | |
| NASHVILLE AND DAVIDSON COUNTY, | ) | |
| TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION *IN LIMINE*
NO. 1 TO EXCLUDE THE EXPERT TESTIMONY OF DR. MICHAEL E. MOOMAW**

Comes now the Defendant in support of its Motion *In Limine* No. 1 to exclude the expert testimony of Dr. Michael E. Moomaw and hereby submits the following memorandum of law.

A.  Dr. Moomaw's Proposed Testimony Should Be Excluded.

The Plaintiffs complain of discrimination against African-American employees of Metro Water Services ("MWS") in post-hiring opportunities. Memo. Op'n, Docket No. 88 at 2. To substantiate their claims, Plaintiffs submitted to the Defendant a Rule 26 expert statement of Dr. Michael E. Moomaw. See Moomaw Report, Docket Nos. 78-7 through 78-8; see also Moomaw Supp. Report, Docket Nos. 78-2 through 78-6.

Under Federal Rule of Evidence 702, a witness can offer expert testimony only if his testimony (1) "will assist the trier of fact to understand the evidence or to determine a fact in

issue," and (2) is reliable because it "is based on sufficient facts or data" and is the product of reliable principles and methods that have been reliably applied to the facts of the case. Fed. R. Evid. 702. The court's "gatekeeping" role as expressed in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) involves a determination of "reliability" and "relevance." Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 429 (6th Cir. 2007) (citing Fed. R. Evid. 702, Advisory Comm. Notes, and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999)).

This Court, in Gibson Guitar Corp. v. Paul Reed Smith Guitars, L.P., 325 F. Supp. 2d 841, 847 (M.D. Tenn. 2004)(Haynes, J.), has identified a number of factors beyond those outlined in Daubert that have some applicability to the instant case, namely: (1) whether "the underlying data exclude other causes to a reasonable confidence level," (2) "how much of the technique is based on the subjective analysis or interpretation of the alleged 'expert'," and (3) "the judge's experience and common sense." Gibson at 847 (citing Hein v. Merck & Co., 868 F. Supp. 230, 231 (M.D. Tenn. 1994)). This Court recognized in Gibson, "[i]t must be noted that 'nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" Gibson at 847 (quoting Gen. Elect. Co. v. Joiner, 522 U.S. 136, 146 (1997)).[1]

Plaintiffs' proposed expert witness, Dr. Moomaw, fails to satisfy these reliability and relevance standards for several reasons.

---

[1] "Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" Daubert at 591. This "'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a **precondition to admissibility**." Id. (emphasis added). As the proponent of the expert evidence at issue – Dr. Moomaw's proposed expert testimony – Plaintiffs bear the burden of establishing that Dr. Moomaw's testimony satisfies the Daubert standard. Daubert at 593 n.10 (citing Bourjaily v. United States, 483 U.S. 171, 175-76 (1987)).

Dr. Moomaw performed a "chi-squared" analysis of the data provided on MWS's EEO-4 Forms (and other Metro forms listed in "Attachment B" to his report) which forms are routinely compiled by MWS and sent to the Equal Employment Opportunity Commission describing the race and gender of the Metropolitan Government's employees.

However, Dr. Moomaw did *not* analyze who was qualified and who actually applied for MWS jobs (i.e., the relevant labor market), as compared to who was ultimately selected, thereby arriving at a "selection rate" for the at-issue jobs. Instead, Dr. Moomaw simply examined the distribution of different races among various job types, thereby describing only the racial composition of the department. See Moomaw Report, Docket Nos. 78-7 ("Specifically, I looked at the proportion of employees by ethnic group (i.e., White, Black, Other) in positions classified at various levels…") (footnote omitted).

● First of all, such studies exploring the "racial composition" of the department are "wholly inadequate" to show disparities in Title VII cases and are *excludable* for these reasons. In Hopson v. DaimlerChrysler Corp., 157 Fed.Appx. 813, 2005 WL 3065966 (6th Cir. 2005), the Sixth Circuit quoted the district judge with approval and upheld the district court's exclusion of plaintiff's statistical data. Id. at *3 (copy attached hereto). The court recognized that plaintiff's statistical analysis "did not 'identify the African-American workers **qualified** for supervisory or managerial jobs' or 'identify employees **who applied** for [the] positions' in question. **By not taking account of non-discriminatory variables, the data are 'not the product of reliable principles and methods**[.]'" Hopson at *3 (internal citations omitted) (emphasis added).[2]

---

[2] Hopson's holding falls squarely within an established line of Supreme Court authority, which outlines the requirements for a statistical analysis to support a finding of a pattern-or-practice of race discrimination. See Teamsters v. United States, 431 U.S. 324, 340 (1977)(describing that nothing in Title VII requires a workforce to mirror the general population); see also Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307 (1977) (citing Teamsters, 431 U.S. at 340 n.20). Specifically, in Hazelwood, applying the principles originally outlined in Teamsters, the Supreme Court described how statistics can be used to establish a prima facie case of discrimination using the pattern-or-practice method of proof. Id. at 307-08. However, in Hazelwood, the Court found that the

Judge Nixon commented on this exact issue in Batts v. N.L.T. Corporation, 1984 WL 992 (M.D. Tenn. 1984) (unpublished decision, copy attached), rev'd. on other grounds, 844 F.2d 331 (6th Cir. 1988). Regarding plaintiff's proposed statistical proof, Judge Nixon held:

> To average all positions held by white employees with all positions held by black employees does not constitute relevant proof of discrimination. Such figures merely constitute naked comparisons of salary without regard to the level of skill, education and training which may show no adverse impact on blacks or a non-discriminatory explanation for any apparent discrepancies.

Id. at *28 (citing Pouncy v. Prudential Insurance Company of America, 668 F.2d 795, 802-803 (5th Cir. 1982)).

The statistical evidence in a disparate impact case must be "of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question." Peace v. Wellington, 2006 WL 3017118, at *4 (6th Cir. Oct. 23, 2006) (quoting Kovacevich v. Kent State Univ., 224 F.3d 806, 830 (6th Cir. 2000) (quoting Scales v. J.C. Bradford and Co., 925 F.2d 901, 908 (6th Cir. 1991)) (copy attached hereto)); and Bacon v. Honda of Am. Mfg., Inc., 370 F.3d 565, 577 (6th Cir. 2004).

The Sixth Circuit has repeatedly held that a statistical analysis in a disparate impact case *must* include a comparison of the relevant labor market:

> A series of Supreme Court cases has provided guidance on what statistical data are sufficient to meet the plaintiff's burden of showing disparate impact. In cases challenging hiring practices discriminatory toward African-Americans, for example, one compares the percentage of African-Americans in the job to the percentage of African-Americans *in the total qualified local labor force or, if labor force data is unavailable, to the percentage of otherwise-qualified African-Americans in the applicant pool.* One then contrasts this ratio with the corresponding ratio for non-protected group members. An EEOC regulation provides, as a rule of thumb, that if the percentage selected from the pool comprises 80% or less of the percentage

---

district court had erred in comparing the Hazelwood School District's "teacher work force to its student population." Id. Rather, "a proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market." Id.

selected from the non-protected group, a discriminatory effect exists. ***In cases involving promotion policies, the relevant inquiry is comparing the number of protected group members benefitting from promotions with the number seeking them; this figure is then contrasted with the corresponding ratio for the non-protected group***.

Phillips v. Cohen, 400 F.3d 388, 399 (6th Cir. 2005)(citing Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642, 650-51 (1989); Connecticut v. Teal, 457 U.S. 440, 448 (1982); 29 C.F.R. § 1607.4(d))(emphasis added).[3]

The EEOC regulations cited in the above excerpt suggest that comparisons may be made between the rates at which people applied for positions and the rates at which those positions were filled (using a "4/5 rule," or "80% rule" to indicate a disparity). However, the EEOC regulations make it clear that this "rule of thumb" is to be applied to a ***"selection rate,"*** not merely a "representation" (i.e., racial composition) of the employer's workforce. See "Uniform Guidelines on Employee Selection Procedures," codified at 29 C.F.R. § 1607.4.D; see, e.g., Zamlen v. City of Cleveland, 906 F.2d 209, 217 (6th Cir. 1990) and Gonzales v. Galvin, 51 F.3d 526, 528 (6th Cir. 1998) (where the Sixth Circuit recognized (1) the use of the EEOC's "Uniform Guidelines" and (2) the use of the guidelines on "selection rates," not merely racial "representation" in the workforce).

---

[3] See also from the other circuits Stastny v. S. Bell Telephone & Telegraph Co., 628 F.2d 267, 274 (4th Cir. 1980)(describing the "necessity that statistical proof designed to show disparities must be fairly adapted to the actual labor pools, work categories and like groupings of persons within which a discriminatory employment practice is alleged to have occurred") (citing Hazelwood, 433 U.S. at 307); E.E.O.C. v. Chicago Miniature Lamp Works, 947 F.2d 292, 302 (7th Cir. 1991)("'The proper comparison is between the racial composition of the at-issue jobs and the racial composition of the qualified population in the relevant labor market.'")(citing Wards Cove, 490 U.S. at 650 (citing Hazelwood, 433 U.S. at 308)). "Thus, the trial court's initial task is to **compare the racial composition of the qualified persons in the labor market with the persons holding at-issue jobs**." Chicago Miniature, 947 F.2d at 302 (citing Wards Cove, 490 U.S. at 650-651)(emphasis added).

Dr. Moomaw's report fails to make any such comparisons. In fact, Dr. Moomaw's report *fails to make any comparisons at all*. Dr. Moomaw admits that his primary purpose was to describe the "representation of African-Americans in various job types, salary types, and pay grades." See Moomaw Supp. Report, Docket No. 78-2 at 13.

The law is clear – such "representation" analyses simply are not reliable and not relevant in a Title VII case. Hopson at *3; Gibson at 847. As a result, they are inadmissible under Daubert. See Johnson at 429 (citing Fed. R. Evid. 702, Advisory Comm. Notes; Daubert at 591-94)(describing the relevance requirement as a precondition to admissibility). Rather, "in order for statistical evidence to create an inference of discrimination, the statistics must show a significant disparity and eliminate nondiscriminatory explanations for the disparity." Barnes v. GenCorp. Inc., 896 F.2d 1457, 1466 (6th Cir. 1990)(citing Segar v. Smith, 738 F.2d 1249, 1274 (D.C. Cir. 1984)). Such "evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals." Segar at 1274 (citing Hazelwood at 308 n.13).

Also, not only does Dr. Moomaw's report fail to make any proper comparisons, his report, even taken as is, fails to account for any obvious non-discriminatory variables whatsoever such as **education, experience, time-in-grade, etc.**[4] that could have been accounted for by simply extracting information from the relevant personnel files (a task that the plaintiffs and Dr. Moomaw for whatever reason failed to avail themselves during three (3) years of discovery – Docket No. 50). Any proposed testimony that fails to account for such variables is inadmissible in a Title VII case. Hopson at *3 ("By not taking account of non-discriminatory variables, the data are not the product of reliable principles and methods."); Gibson, at 847 (considering

---

[4] See Moomaw Supp. Report, Docket No. 78-2 at 12 (where Dr. Moomaw admits that he did not take such variables into account and that his report was intended only as a "broad, general analysis").

whether "the underlying data exclude other causes to a reasonable confidence level"); <u>Barnes</u>, at 1466; and <u>Kuhn v. Iron Creek Coal Company</u>, 1992 WL 207942, *4 (6th Cir. 1992)(reiterating that the Supreme Court expressly found this type of representation-analysis ***not*** probative in <u>Wards Cove</u>).

● Second, Dr. Moomaw's proposed testimony cannot be considered "reliable" where he excluded "61 jobs or individuals" from his report due to what he termed "incomplete information." Moomaw Report, Docket No. 78-7 at 6. Rather than taking steps to review the relevant MWS personnel files (or any other files) during three (3) years of discovery, Dr. Moomaw for whatever reason decided simply to cite "incomplete information" and leave it at that – despite the fact that, in the year 2000, "61 individuals excluded" would have amounted to over 10% of MWS's entire workforce (Table 2000, Moomaw Report, Docket No. 78-7 at 12) and, in 2004, would have amounted to over 8% of the entire workforce (Table 2004, Moomaw Report, Docket No. 78-7 at 12). No attempt was made to gather this "incomplete information" and re-run the numbers. Docket No. 50. Dr. Moomaw simply left it out.

Expert witnesses must employ in the courtroom "the same level of intellectual rigor that characterizes the practice in the relevant field." <u>Kumho Tire</u> at 152. To this end, Dr. Moomaw does not have the freedom to exclude certain individuals from his samples that would make up between 8%-10% of the workforce without some effort on his part (or on the part of the Plaintiffs) to fill in the blanks and re-run the numbers in a supplemental report, especially where there is no description as to the race of these 61 individuals and the statistical significance of these omissions. <u>Sheehan v. daily Racing Form, Inc.</u>, 104 F.3d 940, 942 (7th Cir. 1997) (where the court stated that the expert's statistical analysis was "without evidentiary significance,"

where, among other things, the expert arbitrarily omitted certain people from the sample tested – "The expert should at least have indicated the sensitivity of his analysis to these omissions.")

● Third, Dr. Moomaw's proposed testimony cannot be considered "reliable" where he omitted a key finding regarding promotions from his report, without explanation. Specifically, Dr. Moomaw found, "**There is no significant difference in promotions for Blacks and Whites,**"[5] but omitted this finding from his report. This omission speaks directly to Dr. Moomaw's reliability because the lack of promotions is the crux of the Plaintiffs' case. See Amended Complaint, ¶¶ 2, 37, 42, 52, 66-67, 70, 72, 85-86, 89, 91, 99, 100, 102-105, 111, 117, 118, 120-21, 136-37, 139, 146, 153-54, 156, 165-66, 168-69, 170-71, and 207; see also Memo. Op'n, Docket No. 88 at 2. This finding was only uncovered later among Dr. Moomaw's notes through the discovery process. Rather than being forthcoming with a key finding regarding promotions, Dr. Moomaw chose to bury it ---not voluntarily disclosing it as part of his analysis but instead only producing it after being prodded to do so through the Defendant's discovery requests.

Here, too, Dr. Moomaw does not have the freedom to include some results but exclude others that undercut the Plaintiffs' position, without explanation, especially where those results address the crux of the Plaintiffs' complaint ("promotions") but actually lend support to the Defendant's position. Again, Dr. Moomaw must exercise "the same level of intellectual rigor that characterizes the practice in the relevant field." Kumho Tire, at 152; Sheehan, at 942 ("The expert should at least have indicated the sensitivity of his analysis to these omissions").

---

[5] See "Findings Document," provided on CD-ROM as Resp. to Metro's Follow-Up Interrogs. & Reqs. for Prod, Docket 58-6.

● Fourth, Dr. Moomaw commits the "logical fallacy" in the field of statistics of equating "statistical correlation" with "causation." For example, Dr. Moomaw reports that the racial make-up of MWS "has direct implications for the advancement and salary opportunities afforded to African-Americans." Moomaw Supp. Report, Docket No. 78-2 at 12. Cornist v. B.J.T. Auto Sales, Inc. 272 F.3d 322, 328 (6th Cir. 2001)(describing that equating statistical correlation with "causation" is a "logical fallacy" that should be avoided); see also Tagatz v. Marquette University, 861 F.2d 1040, 1044 (7th Cir. 1988)("Correlation is not causation.")(citing Ste. Marie v. Eastern R.R. Ass'n 650 F.2d 395, 400 (2nd Cir. 1981). Notwithstanding his equating correlation and causation, absent from Moomaw's report is any explanation whatsoever of what led him to reach this "conclusion," when his statistical analysis fails to take into account the relevant labor market or the litany of non-discriminatory reasons that can lead to such results. Under such circumstances, "there is simply too great an analytical gap between the data and the opinion proffered,'" Gibson at 847 (quoting Gen. Elect. Co. v. Joiner, 522 U.S. 136, 146 (1997)), and the proposed testimony is, thus, unreliable and inadmissible.

B. <u>Dr. Moomaw's "Supplemental" Report Constitutes A "Rebuttal" Report Which Falls Outside the Scope of the Court's Case Management Order.</u>

The Metropolitan Government separately requests that Dr. Moomaw's purported "Supplemental Expert Report" be excluded.

In its Revised Case Management Order, the Court required that "[a]ny *supplements* to expert reports shall be filed on or before March 15, 2007. There shall not be any *rebuttal* expert witnesses." Docket No. 35 (emphasis added). On March 13, 2007, Plaintiffs moved to extend

the deadline for "supplemental reports" to March 29, 2007; Plaintiffs did not seek permission to file a rebuttal expert report. Docket No. 49. The Court granted Plaintiffs' motion and permitted Plaintiffs to file their supplemental expert report on March 29, 2007. Docket No. 51.

On March 28, 2007, Plaintiffs submitted Dr. Moomaw's "Supplemental Expert Report" to the Metropolitan Government. Moomaw Supp. Report, Docket Nos. 78-2 through 78-6. Dr. Moomaw's "supplemental" report goes well beyond a supplemental expert report (which was permitted by the Court) and is in reality a *rebuttal* expert report (which was not permitted by the Court or requested by Plaintiffs). See, e.g., Moomaw Supp. Report, Docket Nos. 78-2 through 78-6 at 3-14 (entire section dedicated soled to "Opinions Regarding the Defendant's Expert's Report"). As defined by the Federal Rules of Civil Procedure, "supplementation" is the addition of information to correct incomplete or inaccurate prior disclosures after the supplementing party learns of previously unknown or unavailable information that rendered the prior disclosures incomplete or inaccurate. Supplementation *is not* the presentation of new or additional analyses based upon a set of facts that Plaintiffs knew or should have known long ago. See Sandata Techs., Inc. v. Infocrossing, Inc., Nos. 05Civ09546, 06Civ01896, 2007 WL 4157163, at *4-*6 (S.D.N.Y. Nov. 16, 2007) (copy attached hereto).

In Sandata Technologies, the defendant provided what it referred to as a "supplemental" expert report to the plaintiff at the deposition of the defendant's expert after the time for expert disclosures had passed. Id. at *2. The district court held that the defendant's alleged "supplemental" expert report was not a supplementation of the expert's prior report, but rather a reply/rebuttal report because the "supplemental" expert report was based upon (1) the deposition testimony and reports of the plaintiff's experts and (2) information in documents produced by the plaintiff and in the defendant's possession at the time the defendant's expert prepared his initial

report.  Id. at *4-*6.  The court precluded the defendant from relying upon the reply/rebuttal expert report, which the defendant attempted to disguise as a "supplemental" report, because Rule 26(e) provided no authority for the untimely report and the court had specifically prohibited the filing of such a reply/rebuttal expert report.  Id. at *2, *5.  In particular, the court noted that the duty to supplement an expert report under Fed. R. Civ. P. 26(e) arises "only if the expert subsequently learns of information that was previously unknown or unavailable [and] . . . renders information previously provided in an initial report inaccurate or misleading because it was incomplete."  Id. at *4.  Put another way, Rule 26(e) "does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect."  Id. at *5 (internal quotation marks omitted).

In this case, the bulk of Plaintiffs' "Supplemental Expert Report" does not correct any "inaccurate or misleading" information from Dr. Moomaw's original report.  Sandata Technologies, 2007 WL 4157163, at *5.  Rather, the stated purpose of the report was to issue an "Opinion[ ] Regarding the Defendant's Expert Report."  Moomaw Supp. Report, Docket Nos. 78-2 through 78-6 at 3-14.  By its terms, this is a rebuttal report which was explicitly prohibited by the Case Management Order.  Docket No. 35.  Dr. Moomaw's "supplemental" report also sought to update his original report to include additional data from the "end of 2004 through October 11, 2006."  Moomaw Supp. Report, Docket Nos. 78-2 through 78-6 at 14-25.  This is also improper.

Admittedly, the "additional data" relied on by Dr. Moomaw encompasses dates after he initially prepared his original expert report in 2004.  The problem for Plaintiffs, however, is that this data **was** available to Dr. Moomaw on February 1, 2007, which is the date Plaintiffs' expert

R:\L\L\L-13000+\L-13968\Pleadings\Motions In Limine\MOL-MotInLim1.doc
Case 3:04-cv-00630   Document 108   Filed 02/24/08   Page 11 of 13 PageID #: 2845

11

disclosures were due. Rather than update Dr. Moomaw's report at that time, based on information available to Plaintiffs at that time, Plaintiffs knowingly chose to submit a report based on information that they knew was dated. The Metropolitan Government gave Plaintiffs an open invitation to review this updated information (and presumably provide it to their expert) prior to the expert disclosure deadline, but Plaintiffs never availed themselves of this opportunity. Docket No. 50. Plaintiffs' failure to review the materials provided or otherwise made available by the Metropolitan Government does not entitle Dr. Moomaw to a "second bite at the apple" under the auspices of a "Supplemental" Expert Report.

Based on the above, Plaintiffs' "supplemental" expert disclosures are in reality ***rebuttal*** expert disclosures, which are precluded by the Case Management Order and should be excluded. Docket Nos. 35-51; Sandata Tech., 2007 WL 4157163 at *4-*5.

## CONCLUSION

Plaintiffs' proposed expert testimony would only explore the "racial composition" of the department and not the "selection rates" of any at-issue jobs. As described above, the Sixth Circuit has consistently held such analyses to be wholly insufficient to prove disparities in Title VII cases. Also, as stated above, by not taking into account the non-discriminatory variables (e.g., education, experience, time-in-grade), the proposed testimony is "not the product of reliable principles and methods." Accordingly, the proposed testimony of Dr. Moomaw is unreliable and irrelevant and should be excluded from trial.

In addition, Dr. Moomaw's "Supplemental Expert Report" is actually a rebuttal report, which is not permitted under the Court's Case Management Order, and should be excluded on those grounds as well.

Respectfully submitted,

THE DEPARTMENT OF LAW OF THE
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY
SUE CAIN #9380, DIRECTOR OF LAW

/s/ J. Brooks Fox
J. Brooks Fox, #16096
James W.J. Farrar, #22782
Allison L. Bussell, #23538
Assistant Metropolitan Attorneys
108 Metropolitan Courthouse
P.O. Box 196300
Nashville, Tennessee 37219
(615) 862-6341

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been sent electronically to Martin Holmes, Financial Center, 424 Church Street, Suite 1401, Nashville, TN 37219-2392, via the CM/ECF electronic filing system on this the 24th day of February, 2008.

/s/ J. Brooks Fox
J. Brooks Fox