IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CLAUDE GRANT, ORALENE DAY, PRINCESS MARTINDALE, FALETHA REID, DARRYL MCKIBBENS, DARREL GANT, ANTONIO MCKISSACK, PAMELA TUCKER and SANDRA DERRICK, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE,<br><br>Defendant. | NO. 3 04 0630<br><br>JUDGE HAYNES<br><br>CLASS ACTION COMPLAINT<br><br>JURY DEMAND |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR A NEW TRIAL**

Come Plaintiffs, pursuant to Fed. R. Civ. P. 59, and file this Memorandum in Support of Motion for New Trial. Plaintiffs move for a new trial both as to the class claims for intentional discrimination and each of the eight (8) individual claims for intentional discrimination.

**I.  Standard for New Trial Under Fed. R. Civ. P. 59**

Rule 59 of the Federal Rules of Civil Procedure provides that a new trial may be granted after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).

The authority to grant a new trial rests within the sound discretion of the trial court. Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980) (noting that the authority to grant new trial "is confided almost entirely to the exercise of discretion on the part of the trial court"); Montgomery Ward & Co. v. Duncan, 311 U.S. 243,

251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940).

Generally, courts have interpreted the language contained in Fed. R. Civ. P. 59(a)(1)(A) to mean that "a new trial is warranted when a jury has reached a seriously erroneous result...." Strickland v. Owens Corning, 142 F.3d 353, 357 (6th Cir. 1998)(*citing* Holmes v. City of Massillon, 78 F.3d 1041, 1045-46 (6th Cir. 1996), *cert. denied,* 519 U.S. 935, 117 S.Ct. 312, 136 L.Ed.2d 228 (1996)). A "seriously erroneous result" is evidenced by: "(1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." Holmes v. City of Massillon, 78 F.3d 1041, 1046 (6th Cir.1996) (*citing* Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940),Cygnar v. City of Chicago, 865 F.2d 827, 835 (7th Cir.1989) and Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir.1983)).

## II. A New Trial is Warranted Because the Jury's Verdict is Against the Clear Weight of the Evidence

In Strickland, the Sixth Circuit outlined the analysis that a trial court should undertake in ruling on a motion for a new trial:

> [I]n ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence. It should deny the motion if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable.

142 F.3d at 357 (*quoting* J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co., 936 F.2d 1474, 1487 (6th Cir.1991)).

Plaintiffs are entitled to a new trial because the jury's verdict was against the clear weight of the evidence. Specifically, Plaintiffs clearly established a prima facie case of disparate

treatment under the McDonnell Douglas framework and under the pattern and practice method of proof for the class claims, and under the McDonnell Douglas framework for the individual claims.  Even a cursory review of the trial transcript clearly shows that Plaintiffs presented ample evidence to establish a prima facie case of disparate treatment as to their individual claims and the class claims, as well as abundant proof on the issue of pretext.  Similarly, Plaintiffs clearly established a pattern and practice of discrimination on the class claims utilizing both statistical and anecdotal proof.

  A. **Claude Grant**

The clear weight of the evidence established that in 2002, Plaintiff Claude Grant met with Tom Palko and Scott Potter regarding "opportunities" being created in the Stormwater division, including the program director, manager and administrative support positions, and remedial maintenance program manager. At the time of these meetings, there was no dispute that Mr. Grant was qualified for these positions. After receiving the AMEC Study, Grant located several positions that he could perform but after being avoided by Tom Palko, Grant was told that his position was "too high," which was totally inconsistent with being approached about "opportunities."

The unrebutted proof from Claude Grant was that the requirements for several of these positions were later modified to require engineering degrees, thus no longer allowing Mr. Grant to qualify.  This was just one of many instances introduced at trial whereby Metro Water refused to promote an African American by modifying the requirements for the job, thus eliminating Grant from a position.  Defendant failed to introduce any rebutting testimony showing a legitimate business reason for adding the engineering degree requirement and to the contrary, Grant testified about a similarly situated white employee, Mr. Cathey, who did not have an

engineering degree yet actually supervised engineers.

The similarly situated white employees who were placed into three of these positions included Allen Hand and Danny Smith, who had engineering degrees. Denny Bone was arbitrarily placed into a position without a job posting or interview process. While Defendants argued that Bone was laterally transferred because his position was being eliminated, the same was true for Grant whose position was being eliminated at Consoer Townsend.

Grant also established that he was discriminated against based on race when he was removed from the Leadership Team. At the time of his removal, Grant was the only African American on the Leadership Team and was the first in the history of Metro Water. While Defendant argued that several white employees were also removed from the Leadership Team based on the Brown & Caldwell Study, it was undisputed that the white employees (Barry Jones, Jim Brent, and James Tarpy) were placed back on the Leadership Team over the next several years. Defendant offered no legitimate non-discriminatory reason for Mr. Grant's continued removal from Leadership Team. Thus, the reliance on the Brown & Caldwell Study was merely pretext and the clear weight of the evidence established that its recommendations were not followed by management at Metro Water.

B. **Princess Martindale**

The clear weight of the evidence established that in February 2002, Ms. Martindale applied, qualified, and interviewed for the Office Support Rep III position in Customer Service. Martindale ranked Number One (1) on the register list, but Defendant refused to promote her and place her into this position. In fact, no one received the position because Ms. Martindale's white supervisor, Martha Segal, supposedly "abolished" the position so that Ms. Martindale would not receive the promotion.

Defendant's so-called legitimate non-discriminatory reason for its failure to promote Ms. Martindale into this position was that there was not a "need" at the time. However, this is merely pretext. The fact that Defendant announced the position, received applications, deemed individuals qualified, conducted interviews and that Metro "Main" HR placed Martindale Number 1 on the Register, clearly showed a need for the position. Otherwise, why announce the position in the first place. In addition, the need for the position was bolstered by the fact that Ms. Martindale established that she had been working out of class in this position for a period of time. The clear and unrefuted inference from the evidence is clear – there was a need for the position, but once Ms. Martindale ranked Number One, the "need" mysteriously vanished.

In addition, the clear weight of the evidence established that Defendant disciplined Ms. Martindale in a discriminatory manner based on race, first in March 2002 when she was brought up on false AWOL charges by her white supervisor Christina Binkley. The evidence showed that Ms. Binkley was clearly lying and Ms. Martindale was exonerated of the charges. Despite being caught lying "red-handed," Ms. Binkley was not disciplined at all, which provides strong anecdotal proof of disparate treatment.

After the tapes exonerated Ms. Martindale from the clearly false AWOL charges, she was brought up on false insubordination charges a few days later - again by Christina Binkley with the support of Martha Segal. The unrefuted proof is that the insubordination charge resulted in a 5 day suspension for Ms. Martindale. Based on the foregoing, Ms. Martindale had to appeal these false and fabricated charges to the Civil Service Commission, which overturned the suspension in August 2002. It was unrefuted that the Civil Service Commissioner described these events as a miscarriage of justice.

By contrast to Ms. Martindale, other similarly situated white employees were allowed to

leave work and/or be insubordinate without any reprisal. In contrast to Ms. Martindale, Ms. Binkley was never disciplined for lying on two separate occasions or bringing one of her subordinates up on false charges.[1] The total refusal to discipline Ms. Binkley was in deliberate defiance to two separate fact-finding reports, one recommending that Defendant demote Binkley and the other recommending removal from her supervisory duties. Instead, Scott Potter admitted that he made the decision to simply transfer Ms. Binkley into a non-posted position, keeping her supervisory title and pay grade intact. The clear weight of the evidence showed that Defendant's proffered reason, that Ms. Binkley was a "bad apple", was merely pretext for Defendant's discriminatory disciplinary practices in that African American employees, such as Ms. Martindale, were disciplined more harshly as compared to white employees.

Finally, Ms. Martindale was subject to a racially hostile work environment. The clear weight of the evidence showed that her white supervisors in Customer Service, Martha Segal and Christina Binkley, continuously harassed Ms. Martindale and created an intimidating, hostile, and offensive work environment. Despite Ms. Martindale's repeated complaints to Robin Brown, nothing was done to remedy the situation. Even though Metro Water finally transferred Ms. Binkley, Ms. Segal remained in Customer Service as a supervisor.

### C. Faletha Reid

In August 2002, Ms. Reid applied, was deemed qualified, and interviewed for an Administrative Officer III position. The interview questions posed by were tailor-made for Stephanie Belcher, a similarly situated white employee, who was pre-selected for and ultimately received the promotion. The evidence showed that the job qualifications were changed before the position was announced to no longer require a college degree because Ms. Belcher did not have a

---

[1] It is no coincidence that Antonio McKissack was demoted for "dishonesty" after admittedly performing body work on a private vehicle, resulting in a loss of pay of $2.00 per hour for more than two (2) years.

college degree.

Defendant's purported legitimate non-discriminatory reason was that Ms. Reid scored lower and that is why she was not selected. That is merely pretext because the evidence showed that the whole selection system was rigged in favor of Ms. Belcher and other white employees, who were preselected by specially tailored questions, rigged panel members consisting of the "preselector" and modification of job requirements to allow the preselected persons to qualify for the position.

Further, in 2002, Reid was not allowed to compete for a position which was not posted in the Stormwater division. The position was ultimately given to a Christina Binkley, discussed above. Defendant's purported legitimate non-discriminatory reason was that it needed to laterally transfer Ms. Binkley out of Customer Service because of the recent events involving Ms. Martindale. Mr. Potter simply testified that "Christie" (Binkley) needed a transfer. The Defendant ignored the fact that Ms. Reid would have been qualified for the position had she been given the opportunity to apply. Thus, Defendant's reason is merely pretext for continuing its pre-selection of white employees for certain positions.

### D. Darryl McKibbens

In 2002, Mr. McKibbens applied, was deemed qualified, and interviewed for a Maintenance and Repair Leader 2 position, a position to which McKibbens had performed "out of class" consistently for almost four (4) years. Defendant's purported legitimate non-discriminatory reason for its failure to promote Mr. McKibbens was that he was not qualified for the position because he did not have a high school diploma or a GED or equivalency. Of course, this claim flies in the face of the fact that McKibbens was deemed qualified by "Main" HR and that he had worked consistently in the position out of class for almost four years. It was

unrefuted that one of the prerequisites for working out of class in a position is that the person be qualified for the position in the first place. All the witnesses testified that McKibbens was qualified to do the job and that he displayed the ability to read and write. Further, the unrefuted proof was that a diploma was not truly an essential requirement for the position.

Further, the clear weight of the evidence established that similarly situated white employees who also worked out of class and were pre-selected by their (white) supervisor for the M&R Leader 2 position. Those individuals included: (a) Robert Stokeley (supervised by Greg Nalls); (b) Ricky Taylor (supervised by Mr. Smith); and (c) Larry West. With respect to Larry West, Defendant admitted that West did not have a high school diploma and that it went to the Civil Service Commission to request an exception for him. By comparison, no such request was or has been made on Mr. McKibbens' behalf.

### E. Darrel Gant

In February 2002, Mr. Gant applied, was deemed qualified, and interviewed for a Customer Service Application Tech 3 Billing and Collections position. The evidence showed that the white employee who received this position was pre-selected for the position. Defendant's legitimate non-discriminatory reason for its failure to promote Mr. Gant into the App Tech 3 position was that the other candidate scored higher on the interview and selection process. This is merely pretext since the evidence showed that the Defendant's standard operating procedure was to pre-select those white employees for promotions and then tailor-make the interview questions and qualifications.

In November 2003, Mr. Gant was moved from Customer Service to System Services to prevent a pay increase. Mr. Gant was declassified from a leader to a non-leader position of plumber, which affects his ability for upward mobility given that he was essentially stripped of

his leadership title. Defendant offered evidence it was merely a change in title. This is simply further evidence of Defendant's disparate treatment of African American employees.

### F. Antonio McKissack

Mr. McKissack applied, was deemed qualified, and interviewed for two Maintenance and Repair Leader 2 positions, one day shift and one night shift position, in 2003. He had consistently worked out of class as a Maintenance and Repair Leader 2 for several years. For the night shift position, Chip Ferrell (white) was pre-selected and ultimately awarded the position. The other position, Michael French (white) was pre-selected for the position, but dropped out – so the position was abolished once Mr. McKissack was the only candidate left. Michael French was promoted into the position later in 2003. Defendant's Defendant's primary legitimate non-discriminatory reason for its failure to promote Mr. McKissack into either of these M&R Leader 2 positions was that McKissack scored lower than the white candidate. Again, this is simply pretext because the evidence clearly showed that the whole selection system was rigged in favor of the person who was pre-selected by specially tailored questions, the person on the panel who had already pre-selected the person, or the position would be abolished or put on hold if the pre-selected person was not able to fill the position.

In 2002-2003, Mr. McKissack was disciplined differently regarding his personal cell phone use and was required to pay back $1050 in personal charges, while white employees were not required to pay for any of their personal cell phone use. Mr. McKissack's white comparators included Mike Clouse and Greg Hasty. Mr. McKissack was told by Greg Nalls (white supervisor) that the outstanding cell phone charges were delaying his promotion. Defendant's purported non-discriminatory reason for only requiring Mr. McKissack to repay a portion of his personal cell phone charges was merely that they were "excessive". This is merely pretext since

the evidence clearly showed that no one in management was aware of the amount of any white employees' personal cell phone charges or of any white employee who was required to calculate or repay Metro Water for any personal cell phone usage.

### G. Pamela Tucker

In 2002, Ms. Tucker applied for a supervisor position in Customer Service which was placed on hold after she applied. Later when the position was reopened, Ms. Tucker applied, was deemed qualified, and interviewed for this position. Ultimately, Judy Ward (white) who was pre-selected for the position, received the promotion.

In 2002, Defendant failed to promote Tucker to a lead position, Application Tech 3, in the Billing and Collections Department. Ms. Tucker applied, was deemed qualified, and interviewed. Shannon Wray (white) and Christina Binkley (white) were on the interview panel. Cindy McCullough (white) was pre-selected and promoted to the position. Ms. McCullough did a bad job and was ultimately removed from the position.

In 2003, Defendant again failed to promote Ms. Tucker to a Customer Service Supervisor position. Ms. Tucker applied, was deemed qualified, and interviewed. Lisa Russell (white) was pre-selected and promoted to the position.

Defendant's purported legitimate non-discriminatory reason for its failure to promote Ms. Tucker into all of these positions was that Ms. Tucker scored lower in the interview process. As discussed above, this reason is pretext because the clear weight of the evidence established that the whole selection system was rigged in favor of white employees who were pre-selected by tailored interview questions, the person on the panel who had already pre-selected the candidate, and the modification of the job requirements to suit the person who was pre-selected.

340754v1

10

Case 3:04-cv-00630   Document 195   Filed 05/14/08   Page 10 of 17 PageID #: 3972

### H. Sandra Derrick

In early 2002, Ms. Derrick was told by Director Scott Potter's assistant that she would not receive a posted Public Information Service Officer position even though this position encompassed Ms. Derrick's primary job duties at Metro Water. Thus, Ms. Derrick did not apply. This position was later changed to the Special Assistant to the Director position in 2002. Again, Ms. Derrick was told that she would not receive the position, as management was looking with someone with outside public relations experience. Thus, Ms. Derrick did not apply.

Instead of getting someone with "outside public relations experience," Defendant selected a white employee, Sonia Harvat, who was laterally moved from Public Works.

Thereafter, Ms. Derrick was required to actually train Ms. Harvat in her job duties and responsibilities. Defendant's legitimate discriminatory reason for its failure to promote Ms. Derrick into this position is that Ms. Derrick did not apply for this position. This is merely pretext. Defendant's continuous denial of promotional opportunities to Ms. Derrick by altering job descriptions and job requirements caused Ms. Derrick to give up applying for jobs for which she was qualified. At trial, even Robin Brown admitted that Ms. Derrick was qualified for the position, which is bolstered by the fact that Ms. Derrick actually trained Ms. Harvat.

In addition, Ms. Derrick was exposed to a racially hostile work environment at Metro Water. Ms. Derrick was over-scrutinized, unfairly criticized, unfair performance evaluation between 2002 and July 2004.

### I. Class Claims

Based on the totality of the evidence presented at the nine-day trial of this case, the overwhelming evidence showed that Metro Water Services has subjected its black employees to racially discriminatory promotion, pay, job assignment, and disciplinary practices in violation of

Title VII, 42 U.S.C. § 2000e, et seq.. Through both the statistical and anecdotal evidence presented, the clear weight of the evidence showed that Metro Water's entire selection system was rigged in favor of white employees who were preselected for promotions or job assignments by using specially tailored questions, the person on the panel who had already pre-selected the person, and not questioning the modifications to job requirements.

Metro Water has historically discriminated against African Americans in job placement and promotions. The statistical analyses by Dr. Moomaw provide strong support for this and the distinct pattern of African Americans being historically underrepresented in certain areas while overrepresented in others. This was further bolstered by the anecdotal proof presented as well.

In light of the foregoing, Plaintiffs urge the Court to conclude that the jury's findings were against the clear weight of the evidence presented at trial. Thus, Plaintiffs move this Honorable Court to grant a new trial on these grounds.

### III. A New Trial is Warranted Based on Improper, Prejudicial Conduct by Defense Counsel

Plaintiffs contend that certain conduct by defense counsel during trial was improper and prejudicial, warranting a new trial. The Sixth Circuit has held that if "there is a reasonable probability that the verdict of [the] jury has been influenced by such conduct, it should be set aside." Strickland, 142 F.3d at 358 (*citing* Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749, 756 (6th Cir.1980) and Holmes, 78 F.3d at 1045-46 ("[A] new trial is warranted when a jury has reached a seriously erroneous result as evidenced by ... the proceedings being influenced by prejudice or bias.")).

In Cleveland, the Sixth Circuit agreed that "the determination of the extent of permissible comment and argument by counsel rests primarily in the judicial discretion of the lower court." 624 F.2d at 756 (*citing* Twachtman v. Connelly, 106 F.2d 501, 509 (6th Cir. 1939) and Draper v.

Airco, Inc., 580 F.2d 91, 94 (3rd Cir. 1978)). Indeed, "whether misconduct in a trial of a cause of action is of such a nature that a fair or impartial verdict cannot be reached is in the first instance for the trial court's determination." Cleveland, 624 F.2d at 756 (*citing* Travelers Fire Ins. Co. v. Ranney-Davis Mercantile Co., 173 F.2d 844, 851 (10th Cir. 1949)). "The trial court is, of necessity, clothed with a great deal of discretion in determining whether an objectionable question is so prejudicial as to require a retrial . . . The trial court is in a far better position to measure the effect of an improper question on the jury than an appellate court which reviews only the cold record." Cleveland, 624 F.2d at 756 (*citing* Harris v. Zurich Insurance Co., 527 F.2d 528, 531 (8th Cir. 1975) and Travelers Fire Ins. Co., 173 F.2d at 851). It is for this reason that the Sixth Circuit has declared that "the power to set aside verdict for misconduct of counsel should be sparingly exercised on appeal." Cleveland, 624 F.2d at 756 (*citing* Twachtman, 106 F.2d at 509). Yet, although appellate courts "are always reluctant to grant a mistrial because of counsel's prejudicial statements when the (trial) court has declined to do so," Cleveland, 624 F.2d at 756 (*citing* Draper, 580 F.2d at 97 and New Amsterdam Casualty Co. v. Harrington, 274 F.2d 323, 327 (5th Cir. 1960)), it is nevertheless clear that "counsel should not introduce extraneous matters before a jury or, by questions or remarks, endeavor to bring before it unrelated subjects, and, where there is a reasonable probability that the verdict of a jury has been influenced by such conduct, it should be set aside." Cleveland, 624 F.2d at 756 (*citing* Twachtman, 106 F.2d at 508-509).

In determining whether "there is a reasonable probability that the verdict of a jury has been influenced" by improper conduct, warranting that the verdict be set aside, a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner

in which the parties and the court treated the comments, the strength of the case (e. g. whether it is a close case), and the verdict itself. Cleveland, 624 F.2d at 756.

The Sixth Circuit has held that even curative instructions which the trial court eventually chose to give were plainly, "not sufficient to remove the probability of prejudice." Cleveland, 624 F.2d at 759 (internal citation omitted). The Sixth Circuit noted:

> . . . the bench and bar are both aware that cautionary instructions are effective only up to a certain point. There must be a line drawn in any trial where, after repeated exposure of a jury to prejudicial information, . . . cautionary instructions will have little, if any, effect in eliminating the prejudicial harm. O'Rear v. Fruehauf Corp., 554 F.2d 1304, 1309 (5th Cir. 1977).

Cleveland, 624 F.2d at 759.

It is not necessary for this court to "rely on any of the individual instances or types of impropriety." Cleveland, 624 F.2d at 758-59 (internal citations omitted). In Cleveland, the Court noted that it was not a case of a single, isolated, or inadvertent comment. Rather, the improprieties permeated the entire trial, from opening statement through closing argument, in "a continuing pattern of misconduct." Id. Further, the remarks "were persistently made over the recurring and almost constant objection of counsel for the appellant," Id., and were repeated even though the trial court had sustained the objections and admonished the jury. Id. In addition, defense counsel even persisted after the trial court explicitly reprimanded him for his misconduct. The Court in Cleveland held that the cumulative effect of counsel's remarks undoubtedly served to leave the intended, indelible impression upon the minds of the jurors. Id.

During the course of the nine-day jury trial in this case, Plaintiffs' counsel objected and the Court properly noted numerous times, for example that defense counsel 1) suggested something improper to the jury (Exhibit 2, April 24, 2008 Rough Draft Trial Tr. p. 81); 2) tried to lay an improper inference (Exhibit 2, April 24, 2008 Rough Draft Trial Tr. p. 49-50); and 3)

tried to get a witness to testify improperly about a document (Exhibit 2, April 24, 2008 Rough Draft Trial Tr. p. 52-53). In addition, Plaintiffs' counsel and the Court took issue with defense counsel's attempt at "funneling" most of their evidence through one witness (Exhibit 1, April 23, 2008 Rough Draft Trial Tr. p. 3-4) and attempts to improperly summarize by mischaracterizing the witnesses' testimony. (Exhibit 1, April 23, 2008 Rough Draft Trial Tr. p. 9).

Two prime examples of Defendant's efforts to introduce clearly irrelevant evidence occurred during the cross examination of Claude Grant and the cross examination of Robin Brown, Defendant's designated representative at trial. Grant was asked about a harassment complaint lodged against him by a female employee in 1997 in an effort to impeach Grant. The incident, which occurred eleven (11) years before trial was thoroughly investigated and Grant was exonerated *by Defendant itself*. Further, there was absolutely no proof that the incident had any adverse effect on Grant's further promotional opportunities.

In a similar vein, Robin Brown testified about Darrel Gant's alleged "anger problem" that culminated in his suspension. When asked on cross examination that Gant had never been accused of displaying anger either before or after this incident, Brown responded that Gant had poked a female employee in the stomach stating "I can help you get rid of that" (suggesting that Gant could help the female employee lose weight). The totally inappropriate interjection of this unresponsive answer to a cross examination question is typical of matters improperly placed at issue in the trial.

The aforementioned are just isolated examples of things that occurred throughout the trial. At the end of trial, outside the presence of the jury, when defense counsel attempted to make another offer of proof, the Court again noted that what defense counsel was trying to do then and throughout the trial was to introduce a host of other evidence through a witness who

was not personally involved and the evidence was thus unreliable. (Exhibit 2, April 24, 2008 Rough Draft Trial Tr. p. 173-174).

Finally, at the close of Defendant's proof, in the presence of the jury when asked if Defendants had any additional proof, defense counsel stated that they had the "offer of proof." As correctly noted by the Court on the records, defense counsel improperly suggested to the jury that there was something else out there that they were not hearing. (Exhibit 2, April 24, 2008 Rough Draft Trial Tr. p. 167-168).

After the last event, the Court stated that it would consider how to address defense counsel's conduct and the best way to remedy defense counsel's conduct in ignoring the Court's repeated rulings and trying to suggest to the jury that there were other matters "out there" that were being kept from them because they were inadmissible. (Exhibit 2, April 24, 2008 Rough Draft Trial Tr. p. 168-169).

Moreover, on the final day of trial, the Court (not once but twice) suggested that it was considering a new trial. (Exhibit 3, April 25, 2008 Rough Draft Trial Tr. p. 19, 32).

Finally, following closing arguments, the Court told defense counsel that the jury instructions would have to be revised again because defense counsel improperly told the jury that that only way plaintiffs could recover was under the pattern and practice method of proof. (Exhibit 3, April 25, 2008 Rough Draft Trial Tr. p. 110).

Based on the conduct of defense counsel throughout the nine-day jury trial in the presence of the jury, Plaintiffs respectfully submit that the Court should conclude that there is a reasonable probability that the verdict of the jury was influenced by improper conduct of defense counsel, warranting that the verdict be set aside based upon the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues

before the jury, the manner in which the parties and the Court treated the comments, the strength of the case, and the verdict itself.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that that the Court grant their Motion and enter an Order granting Plaintiffs a new trial on their individual claims for intentional discrimination, as well as the class claims based on intentional discrimination.

Respectfully submitted,

STEWART, ESTES & DONNELL, PLC

By: s/ Martin D. Holmes
Martin D. Holmes, #12122
Colleen M. Sweeney, #24739
Fifth Third Center, Suite 1401
424 Church Street
Nashville, TN 37219
Ph:   (615) 244-6538
Fax:  (615) 256-8386
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of May, 2008, a true and exact copy of the foregoing has been served upon filing users through the Electronic Filing System and to all parties not served through the Electronic Filing System via U.S. Mail to:

J. Brooks Fox, Esq.
James W.J. Farrar, Esq.
Allison Bussell, Esq.
The Department of Law
Metropolitan Government of Nashville and Davidson County, Tennessee
Metropolitan Courthouse, Suite 108
Nashville, TN 37201

*Attorneys for Defendant*

s/ Martin D. Holmes
Martin D. Holmes