IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CLAUDE GRANT, ORALENE DAY, | ) | |
| PRINCESS MARTINDALE, FALETHA REID, | ) | |
| DARRYL MCKIBBENS, DARREL GANT, | ) | |
| ANTONIA MCKISSACK, PAMELA TUCKER, | ) | |
| SANDRA DERRICK, individually and on | ) | |
| behalf of all others similarly situated, | ) | |
| | ) | NO. 3:04-0630 |
| **Plaintiff,** | ) | **JUDGE HAYNES** |
| v. | ) | |
| | ) | |
| METROPOLITAN GOVERNMENT OF | ) | |
| NASHVILLE AND DAVIDSON COUNTY, | ) | |
| TENNESSEE, | ) | |
| | ) | |
| **Defendant.** | ) | |

# M E M O R A N D U M

Plaintiffs, Claude Grant, Oralene Day, Princess Martindale, Faletha Reid, Darryl McKibbens, Darrel Gant, Antonia McKissack, Pamela Tucker, and Sandra Derrick, individually and on behalf of all other similarly situated, filed this class action under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e et seq., and 42 U.S.C. § 1981 against the Defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro"). Plaintiffs are current and former employees of Metro Water Services ("MWS"), a Metro governmental department and seek to represent a putative class of all current, past, and future MWS black employees from January 1, 2000 to the present.

The gravamen of Plaintiffs' complaint is that MWS engages in systemic practices of discrimination against black employees in post-employment opportunities, including disparate job assignments, promotions, pay, accommodations, discipline, and other terms and conditions of their employment. Plaintiffs asserted theories of disparate treatment and disparate impact for

1

their individual and class claims. With the exception of Martindale, who worked at MWS for four and one-half years, the named Plaintiffs had between fourteen (14) and thirty (30) years of service with MWS. Id. Each Plaintiff filed timely charges with the Equal Employment Opportunity Commission ("EEOC") and the Tennessee Human Rights Commission ('THRC") and received a right-to-sue letter from the EEOC.

In earlier proceedings, the Court concluded that Plaintiffs met the prerequisites of class certification under Rule 23(a) and Rule 23(b) (2) of the Federal Rules of Civil Procedure because Plaintiffs seek primarily declaratory and injunctive relief related to programmatic and institutional changes in Metro Water's employment practices.[1] The Court also denied Metro's motion for summary judgment[2] (Docket Entry No. 89) concluding that material factual disputes existed.

The action proceeded to trial on April 15-18, and April 21-25, 2008. Plaintiffs' individual and class claims based on disparate treatment and hostile work environment were decided by the jury. After proof and closing arguments, the jury found for the Defendant on Plaintiffs' disparate treatment and hostile work environment claims of the individual Plaintiffs' and the class. The Court reserved ruling on the Plaintiffs' individual and class claims based on their disparate impact theory. (Docket Entry No. 191). The Court later granted the Plaintiffs' motion for a new trial on their disparate treatment claims and set a new trial date. (Docket Entry No. 223). Metro then filed a notice of appeal of the Court's Order granting Plaintiffs' motion for a new trial.

---

[1] Metro unsuccessfully appealed the Court's Order granting class certification. See Docket Entry No. 30. After initial discovery, Metro later moved to decertify the class (Docket Entry No. 55) that the Court denied. (Docket Entry Nos. 88 and 89). Metro also pursued an unsuccessful appeal of that ruling (Docket Entry No. 99).

[2] The parties submitted voluminous materials on this motion. See Docket Entry Nos. 57 through 69, 76 through 81 and 86. The Court also granted the parties' numerous motions for extensions of time. See Docket Entry Nos. 43, 71, 73, 83, 193 and 216, including a joint motion to continue the trial. (Docket Entry No. 93). Metro also filed sixteen pretrial motions (Docket Entry Nos. 111, 112, 113, 114, 115, 116, 117, 119, 120, 122, 123, 124, 125, 147, 148 and 175).

(Docket Entry No. 225). Plaintiffs then moved to stay the Court's decision on their disparate impact claims pending completion of Metro's appeal (Docket Entry No. 228) and the Court granted that motion. (Docket Entry No. 232). Metro then filed a petition for writ of mandamus for a ruling on Plaintiffs' disparate impact claims in the Sixth Circuit. (Docket Entry No. 233). Metro's notice of appeal divested this Court of jurisdiction to decide any claims except for ancillary matters. Pickett v. Howes, 549 F.3d 377, 383 (6th Cir. 2008). Thus, with Metro's notice of appeal, the Court lacked the authority to decide Plaintiffs' disparate impact claims that are not ancillary matters.

On July 8, 2009, in light of the pending Sixth Circuit proceedings, the Court administratively closed this action to be reopened upon a motion of any party. (Docket Entry No. 235). On June 4, 2010, the Sixth Circuit remanded this action affirming the Court's decision to grant a new trial on Plaintiffs' disparate treatment claims and requiring a decision on Plaintiffs' disparate impact claims within ninety (90) days of its decision. (Docket Entry No. 236).

## A. FINDINGS OF FACT

### 1. MWS's General Structure

MWS, a Metro department, employed 688 employees, with minor variations, during this litigation. Historically, blacks have not held upper level management positions at MWS. Scott Potter, MWS's current director who is white, replaced Lester "Buddy" Williams, who is also white. Under its organizational structure, MWS has eight divisions: Administrative, Customer Service, Operations, Engineering, Human Resources, Information Services, System Services and Stormwater. Of MWS's Assistant Directors for each division, David Tucker is the only black

3

assistant director and he was promoted in 1999. Prior to his promotion, MWS never had a black employee serve as an assistant director.

Below the assistant directors are MWS's other managers, supervisors, and other upper-level personnel who are: (1) Sonia Harvat, public information officer and Special Assistant to Director; (2) Glenn Mizell, finance manager; (3) Ann Dooley, Human Resource Manager; (4) James Brent, information systems division manager; (5) James Tarpy, special projects manager; (6) John Kennedy, deputy director of government council relations (all the above managers are white), and (7) Robin Brown, MWS's human relations manager who transferred in 2005 and was replaced by Ann Dooley, who is white.

MWS has a "Leadership Team" that has ten (10) employees of whom only one, Tucker, is black. Metro Water's "Leadership Team" sets MWS's rules, policies and budget and decides internal matters. See Plaintiffs' Exhibit 204. Plaintiff Grant who has been a MWS employee since 1973, was at one time a member of the Leadership Team and the first black employee to be so named under a prior MWS director. Among the Leadership Team members, Grant held the lowest classification and the lowest salary. According to Grant, he was removed from the Leadership Team after he disagreed with MWS's former director on promotion issues. (Docket Entry No. 199 at 74). MWS transferred Grant to a private agency working with MWS.

The next MWS management level is the "Process Owners Group" comprised of 35 to 40 employees responsible for various decisions in MWS. When this action was filed, two African-Americans were among its members. As of 2007, 6 or 7 members of the 35 to 40 "Process Owners Group" are black. (Docket Entry No. 208 at 206-07).

Of MWS's 688 employees, 178 employees are black, comprising twenty-six percent (26%) of the MWS workforce. Although minor variations exist from year to year, MWS has

maintained a black workforce of at least 26%. Anthony Waggoner, a black employee at MWS since June 1988, has been supervised for most of his MWS career by an African-American. (Docket Entry No. 210 at 96). In 1996 Waggoner became a maintenance and repair leader 2. (Plaintiffs' Exhibit 51). Yet, Waggoner cited his crew's inability to secure proper equipment for their assigned field duties. (Docket Entry No. 210 at 97-98). During his career, the majority of Waggoner's crew were black and his crew was referred to as the "Black Empire." Id. at 98. By contrast, predominantly white crews were not given the name "White Empire." Id. at 213-214.

MWS employees are subject to the Metro's general pay plan applicable to most Metro employees. Under this plan, there are several "Pay Types": (1) "DP", for Department Directors; (2) "SR", for "Standard Range" employees whose primary duties involves "knowledge or experience of an administrative, clerical, scientific, artistic, or technical nature not related to trade, craft, or manual labor work;" and (3) "TLS", for "Trade and Labor" employees, who are in turn subdivided into three subcategories: (a) "TG", for positions with worker responsibility; (b) "TL", for positions with lead responsibility; and (c) "TS", for positions with supervisory responsibility. Within each grade, there are numerical ranges, representing incremental pay increases. All MWS employees are classified by pay type and pay grade and fall within one of the ranges. Although MWS utilizes the Metro pay scales for salary type and pay grade, the actual decision-making process in classifying an employee within a particular pay grade at MWS is subjective in nature, and is conducted without any formalized criteria.

For promotions, all Metro departments are bound by the promotion policies and procedures of the Metro Civil Service Commission ("MCSC"). Yet, a promotion to a "targeted position" is not included in MCSC's competitive promotion process. (Docket Entry No. 208 at 93). MCSC's promotion process begins with a job description that sets forth the minimum

requirements that are based upon the responsibilities of the position. Most positions with MWS have pre-established job descriptions set by MCSC, but the testimony at trial was that MCSC adopts MWS's submissions on job descriptions. (Docket Entry No. 199 at 38, 105-106, 114). MWS can also request exceptions from job requirements for any position. (Docket Entry No. 208 at 190, 193). The job description and job announcement are posted publicly for all interested applicants to apply. MCSC prepares a list of the top three (3) to five (5) eligible applicants for the position, but MWS is not required to select the highest ranked applicant. Qualified applicants are notified and an interview panel comprised usually of three members with a MCSC staff member serving as a proctor. MWS recommends panel members to MCSC. MWS decides which applicant(s) to interview.

## 2. MWS's Discriminatory Practices

Plaintiffs identify several elements of MWS's facially neutral promotion and compensation practices that fall more harshly on MWS's black employees than MWS's white employees. These elements include MWS's altered job requirements, lateral transfers, and out-of-class practices, selection interviews for promotions, and compensation practices that cause significant statistical imbalances among black and white employees at MWS as to promotions and compensation.

### a. MWS's Altered Job Qualifications Practice

The proof establishes that at MWS, the minimum qualifications in job descriptions and announcements are frequently tailored or altered from the original job descriptions to fit the person whom MWS's management desires to fill the specific position. An example of MWS's "tailoring" of job qualifications in a job announcement is the filling of the System Services

6

Manager - Stormwater - NPDES Permit position, which Plaintiffs contend was crafted to fit one employee, Michael Hunt, who is white.

Linda Green is a black female who obtained her bachelor's degree in biology from the University of Tennessee in 1976 and received her Masters of Art in Human Relations, Organizational Development from Trevecca Nazarene University in 1999. Green also obtained her Grade IV Water and Grade IV Waste Water licenses from the State of Tennessee. Prior to her MWS employment, Green was employed by the United States Army Corps of Engineers from 1976 through May 1988. (Docket Entry No. 200 at 90). While employed by the Corps of Engineers, Green was a biologist who collected water samples and performed analyses. For a time, Green was transferred to the Corps' district office in Florida, serving as manager of the Corps of Engineers' permit program.

Green began her work at MWS in 1994 (Plaintiffs' Exhibit 15c; Docket Entry No. 200 at 98) as an assistant plant manager, but Green did not receive a promotion for over nine (9) years. In September 2003 Green she was promoted to treatment plant manager supervising approximately 60 MWS employees. (Plaintiffs' Exhibit 168g). In 2005, Green applied for the position of Systems Services Manager - Stormwater - NPDES permits. Id. MWS deemed Green unqualified for this position because she lacked the four years' experience in NPDES "stormwater" permits that was included in the job announcement as a job requirement. Green was not interviewed for this position. (Docket Entry No. 206 at 102).

According to MWS, the only qualified applicant was Michael Hunt, a white employee. Id. at 103. Yet, Green performed the exact work required for this position during her work at the United States Army Corps of Engineers. Green actually wrote NPDES permits and managed a regional office of the Corps of Engineers, supervising 27 employees who also wrote NPDES

permits. Id. at 93-96. As to the purported lack of four years experience in "stormwater" NPDES permits, Green explained that the NPDES permit program is a single program that is not designed nor limited to stormwater.

In other instances, the degree requirements were altered and the effect was a hiring of a white employee. In August 2002, Plaintiff Reid[3] applied for an administrative services officer 3 position, a job for which she was qualified. The job description originally required a bachelor's degree for the position. When the job announcement for this position was posted, the bachelor degree requirement was removed. The position was awarded to Stephanie Belcher, who is white. Reid has a bachelor's degree. Belcher did not have a bachelor's degree. Under the original job description, Belcher was ineligible for this position. (Docket Entry No. 202 at 106-107, 110: Plaintiffs' Exhibit 102; Plaintiffs' Exhibit 23a). Reid also applied for the administrative service officer 4 position in Human Resources. The job description for administrative service officer 4 position originally required a bachelor's degree, but that requirement was eliminated. Ann Dooley, the white employee who received the interim appointment to this position in September 2005, does not have a bachelor's degree. Id. at 122-126, Plaintiffs' Exhibit 117. Dooley replaced Robin Brown, who is black. Robin Brown holds a bachelor's degree and a master's degree in business administration. Dooley did not testify at trial.

Plaintiff Grant identified two promotion possibilities where MWS added an engineering degree as a requirement when these positions were posted, disqualifying Grant as a potential applicant. (Docket Entry No. 199 at 88). The recipients of the positions, Allen Hand and Danny Smith, are both white employees. Id. at 88-89. According to Grant, an engineering degree was

_____

[3] Plaintiff Reid who worked for Metro Water since 1990 received her first promotion in 2001 to work in MWS's engineering department, but this position "was split into two positions" filled by Reid and a white employee. Id. Reid, who has an Associate and Bachelor's degrees, was transferred from this position due to a "lack of work", but the white employee, who does not have a college degree, remained in that position.

8

not an essential job requirement of the positions that were awarded to Hand and Smith. Id. at 115. In fact, the individuals who received these positions are supervised by a MWS employee who does not have an engineering degree. Id. at 88, 93, 116.

Plaintiff McKibbens was hired as a maintenance and repair worker 1. (Plaintiffs' Exhibit 95). In this position, McKibbens checked overflows of manholes, responded to consumer complaints, performed smoke testing, and cleaned sewers and sewer lines. (Docket Entry No. 199 at 123-124). In 1988, McKibbens's job was retitled utility system helper 1, but his duties remained the same. Id. McKibbens left MWS from April 1998 until November 2002 and upon his return, McKibbens was assigned the position of utility system helper 1. (Plaintiffs' Exhibit 95). McKibbens received only one promotion during his eighteen (18) year career at MWS, when in August 1996 he was promoted to the position of maintenance and repair leader 1. Id. In this latter position, McKibbens's duties remained the same except that he was provided a helper. Thus, McKibbens would "lead" a single laborer whose title was maintenance and repair helper 1. As a maintenance and repair leader 1, McKibbens operated equipment, such as a boom truck or vacu-truck, and the helper assisted. (Docket Entry No. 199 at 124-125). McKibbens always received excellent evaluations and was never criticized for his work performance. Id. at 125.

On numerous occasions, McKibbens attempted to secure a promotion to the position of maintenance and repair leader 2. The duties and responsibilities of a maintenance and repair leader 2 are not different from those of maintenance and repair leader 1, except that a maintenance and repair leader 2 may be assigned a second laborer. Id. On one occasion when McKibbens applied for the maintenance and repair leader 2 positions, a MWS official informed him that he was not qualified because McKibbens lacked a high school diploma. Yet, McKibbens had previously been found qualified for the very same position in May 2001, despite

9

his lack of a high school diploma and had received a letter from the MCSC confirming that he was qualified. Id. at 141-143. McKibbens completed the 11th grade, but did not have a high school diploma. Id. at 121. McKibbens testified that a high school diploma was not an essential job requirement for the maintenance and repair leader 2 position. McKibbens successfully worked this position on an "out-of-class"[4] basis for years, id. at 140-141, and without any complaints about his abilities to read or write. (Docket Entry No. 208 at 210). While working as a maintenance and repair Leader 2 on an "out-of-class" basis, McKibben actually supervised Danny Jones, Mike Farley, Phillip Raines, Scott Crimmons and Hobert Winfrey, who all were subsequently promoted to maintenance and repair leader 2 positions. Id. at 169.

Prior white MWS employees in this maintenance and repair leader 2 position lacked a high school diploma or a GED and performed without complaint. Larry West who is white, held the maintenance and repair leader 2 position without a high school diploma. (Docket Entry No. 208 at 189). According to Robin Brown, MWS former human relations manager, West held that job because MWS "had no one else to do that job." Id. at 190-91. MWS also applied to the MCSC for an "exception to the high school diploma or GED position." Brownie Maynard, a white MWS employee with a eighth grade education also held this position, but he was grandfathered in when this job description was changed to require a high school diploma. Id. at 89.

Although MWS refused to promote McKibbens to maintenance and repair leader 2 because he did not have a high school diploma, other white employees without high school diplomas were promoted. For example, several white employees without this qualification were

---

[4]"Out-of-Class" is a practice by which MWS assigns its employees to perform another job, usually a higher level job at a higher rate of pay, but without a formal promotion.

promoted after working 100 days on an out-of-class basis in the higher position: Ricky Taylor, Robert Stokely, and Larry West. (Docket Entry No. 199 at 30, 146).

In 1997, the educational requirements for this position were changed from an eighth grade requirement to a high school diploma or equivalency requirement. (Docket Entry No. 208 at 89). After being informed of the high school diploma or GED requirement, McKibbens took the Metro Equivalency Test and although he did not receive his actual tests results, he was told by email that he failed. Id. at 147. McKibbens later received a test record of his failing that was "pasted" with white strips. (Docket Entry No. 199 at 146-150). McKibbens then took the Metro equivalency test again and passed in January 2003. Id. and Plaintiffs' Exhibit 123. Despite passing the Metro Equivalency examination, McKibbens has yet to receive a promotion to the maintenance and repair leader 2 positions. Since returning in 2005, McKibbens has applied for a maintenance and repair leader 2 position. MWS awarded these positions to white employees. Id. at 169.

Anthony Waggoner, McKibbens' supervisor, corroborated McKibbens' excellent performance as maintenance and repair leader 2 on an "out-of-class" status. Waggoner also confirmed that McKibbens had the qualifications for the maintenance and repair leader 2 position and that a high school diploma or general equivalency diploma or Metro equivalency was not essential to the position, so long as an individual could read and write. When McKibbens worked out of class as a maintenance and repair leader 2, McKibbens was required to complete all of the paperwork which Waggoner reviewed. According to Waggoner, McKibbens did not have any problem with the paperwork nor did McKibbens ever show an inability to read and write. (Docket Entry No. 210 at 102-103; Docket Entry No. 199 at 269). Other witnesses, including Claude Grant and Darrell Gant, corroborated these witnesses' testimony that a high

11

school diploma was not an essential job requirement for a job. To be sure, Vernon Frye, a former MWS manager testified that the high school diploma requirement was because the position required the person to read and write. Given the numerous white employees who held the position without a high school diploma and McKibbens's actual work in this position for years, the Court finds that a high school diploma was not an essential job requirement for maintenance and repair leader 2 position.

Plaintiff McKissack, who began his employment with Metro Water in 1990, currently maintains vehicles as a maintenance and repair worker. McKissack also sought a promotion to the maintenance and repair leader 2 position and was one of two applicants. After the white employee decided not to pursue this position, MWS decided there was not any need for this open position.

Plaintiff Derrick, who received her bachelor's degree in English from Tennessee State University in 1985, was hired by MWS on January 16, 1989 as a customer service representative in the customer service division. During her interview, Derrick was told that her degree would benefit her future job progression at MWS. (Docket Entry No 200 at 172-174). Despite repeatedly applying for higher positions, Derrick received her first promotion in 2007, over eighteen (18) years after her initial hiring and after the filing of this action. Id. at 180-181. Derrick described instances in which job requirements were altered or changed to favor white employees. When Wes Gallet, an African-American, applied for the administrative officer 4 position, a bachelor's degree was required. The job requirement for an administrative officer 4 position was later changed, eliminating the bachelor's degree requirement. Ann Dooley, a white employee, received the position, an interim appointment to MWS human relations manager. As noted earlier, Robin Brown, the former MWS human relations manager, has bachelor and

masters degrees. Dooley, who does not have a college degree, replaced Brown and has served as the interim human relations manager since September 2005. Id. at 185-187. In addition, the college degree requirements were modified for several customer service assistant manager positions allowing Gary Ragland and Judy Ward, white employees, to qualify and to be selected. Id. at 224-226.

### b. MWS's Lateral Transfer Practice

"Lateral transfers" are transfers of employees between MWS or any other Metro agency employees into MWS positions. Plaintiffs contend lateral transfers are another MWS promotion practice that adversely impacts Plaintiffs and other black employees at MWS. Under this practice, MWS employees who are white were effectively awarded promotions that were not posted nor filled through MCSC's competitive process. (Docket Entry No. 208 at 211). This interagency practice requires the approval of their respective agency heads and requires only that the transferred employee receive the same pay grade and job duties comparable to the transferring employee's prior job. Id. at 211.

As an example of this practice, Plaintiff Grant explained that in April 2002, the Stormwater Division was moved to MWS from Metro's Department of Public Works ("DPW"). (Docket Entry No. 199 at 77-78). Tom Palko, a white employee who was previously an engineer 3 with Stormwater at DPW, was promoted in April 2002 to the position of Assistant Director of MWS's Stormwater division. Grant, who has been at MSW since 1973 and held management experience considered himself more qualified for this position, but he was not allowed to apply or compete for it. In addition, although Grant's position was phased out, he was not considered for a lateral transfer. (Docket Entry No. 199 at 90-91; Docket Entry No. 207 at 13-17).

13

Grant's qualifications for these open positions were confirmed by Vernon Frye, who worked at MWS since 1972 and currently holds the title of Special Project Manager. Frye was promoted several times during his tenure at Metro Water, and ultimately became the assistant director of system services under Lester "Buddy" Williams, the former MWS director. (Docket Entry No. 200 at 47-49). Frye has known Grant since approximately 1980, when Grant worked for Frye, then assistant director of system services. Id. at 51-52. Under Frye's supervision, Grant supervised between 15-20 employees and performed his job very well. Id. at 55. According to Frye, Grant is an excellent employee, a hard worker and probably had as much or more experience than anyone in MWS's sewer system. Based on his years of experience and knowledge, Frye opined that Grant was qualified to hold an assistant director position in the Stormwater Division that was given to Palko. Id. at 60-61, 68. Although Frey testified that Grant could sometimes be somewhat "over-bearing", Frey agreed that other higher white managerial officials have similar over-bearing personalities, and this characteristic was not unique to Grant among MWS's management. Id. at 84-85.

On May 20, 2002, Denny Bone, a white employee, transferred laterally from his administrative services manager position in Metro's human resources department to the administrative services manager in its Stormwater division. Plaintiff Grant who had been with MWS since at least 1973 and was also an administrative manager at MWS with more experience, would have applied for this position, if the position had been posted.

There are other instances of lateral transfers to higher management positions filled with MWS employees who are white. John Kennedy, who is white, was transferred to the newly created position of deputy director by Potter, MWS's Director. Potter did not post the position nor were applicants solicited. As MWS's deputy director, Kennedy earns a salary equivalent to

14

MWS's assistant directors. In another instance, Kim Minton, a white employee was laterally moved from MWS's human resources to work for Sonia Harvat in MSW's public relations. (Docket Entry No. 200 at 226-227). Plaintiff Reid who had several years of experience in MWS's public relations, trained Harvat, a biologist, for her public relations position, but Reid was not allowed to compete for this position under the normal job posting process. Christina Binkley, a white employee, was also transferred into a position in MWS's Stormwater Division, but Reid was not allowed to compete for that position. (Docket Entry No. 200 at 139-140). Other white employees who were transferred into MWS positions outside of the competitive process include Lisa Fuqua, Dee Dee Vogt and Jim Pollus. Id. at 139-140. Robin Brown explained that Vogt and Pollus were facing a layoff (Docket Entry No. 208 at 25, 27-28). Harry Gilmore, another lateral transfer, was transferred to MWS to complete the last year or so for his eligibility for Metro retirement. Id. at 28.

### c. MWS's Selective Interview Practice

The interview process for promotions at MWS is also cited as a MWS practice that contributes to the disparate impact on MWS black employees who seek promotions. Although open positions are posted, interested applicants can apply and MCSC provides a list of qualified applicants. Plaintiffs' proof establishes that the applicable MWS department manager decides which applicants on this list are to be interviewed by MWS's management-selection panel. Department managers possess the discretion whether to interview an applicant and whether to interview by telephone or in person.

On "most occasions," the "usual practice" is that the supervisor of the promotion position at issue serves on the interview panel. (Docket Entry No. 208 at 212). This panel varies in number and composition for each available position during the interview process. The MWS

15

panel members openly discuss the scoring of each applicant and adjust individual scoring, if variations exist. There was testimony that in MWS interviews, questions are often asked that only the preselected candidate can answer and are unrelated to job-necessity. (Docket Entry No. 202 at 95-96).

As examples of this practice, Green was not interviewed for the position of Systems Services Manager - Stormwater - NPDES permits. (Docket Entry No. 200, Plaintiffs' Exhibit at 102). In one of Plaintiff McKibbens's applications for the maintenance and repair leader 2 position, after the interviews, McKibbens ranked Number One on the Eligibility Register, Glenn Word, a white employee ranked Number Two, and Michael French, a white employee ranked Number Three. Instead of selecting McKissack, MWS administered a second test and conducted a second interview. Michael French was not required to take a second test or a second interview. After the second interview, Michael French was ranked Number One, McKibbens Number Two and Word Number Three. French was awarded the position. Id. at 118-121. French did not testify at trial.

In 2001, Plaintiff Tucker applied for a supervisor position in customer service. (Docket Entry No. 199 at 185). Although Tucker was qualified, she was not interviewed. MWS awarded the position to Judy Ward, a white employee with less seniority than Tucker and similar experience. Id. at 189-190.

### d. MWS's "Out-of-Class" Assignments

MWS's "Out-of-Class" practice occurs where an open position exists either due to an employee being away from work or based upon MWS's needs. If the supervisor believes that an employee has the ability and the knowledge to perform that position, the selected MWS employee works in that position on a temporary basis without a promotion. MWS's supervisor

assignment of the employee in these circumstances is referred to as "out-of-class" work. While working "out-of-class," the employee should receive any increased pay for that position. (Docket Entry No. 199 at 126-27). According to Plaintiffs and actual MWS practice, if an employee works "out-of-class" for more than 100 days, that employee is promoted into the higher position.

During his tenure at MWS, McKibbens observed white employees who worked out-of-class for more than 100 days and "automatically" received promotions to the elevated position. (Docket Entry No. 199 at 128-130). The white employees include Robert Stokely, Ricky Taylor, Larry West, Billy Ranes, Clyde Smith, and Willie Hoggett. Id. In late 1999, Waggoner, his supervisor, placed McKibbens in the maintenance and repair leader 2 position on an "out-of-class" status not because of an absent employee, but based upon MWS's need given the increased demand for MWS services and the need for more equipment on the road to perform maintenance and repairs. Id. at 131. From the end of 1999 until 2003 when he suffered a broken ankle, McKibbens regularly worked "out-of-class", but was not promoted to the maintenance and repair leader 2 position. Id. at 131-132; Plaintiffs' Exhibit 24). After suffering a broken ankle, McKibbens was on a leave of absence from July 2003 until 2005. Upon his return, McKibbens continued to work the position "out-of-class" periodically. (Docket Entry No. 199 at 134, 137-138). Despite these years of out of class work as a maintenance and repair leader 2, McKibbens was deemed unqualified and denied promotions to this position.

Similarly, when the maintenance and repair leader 2 position was posted in 2002, Plaintiff McKissack applied because he had worked in the position "out-of-class," but the position was given to Tim Agee, a white employee. (Docket Entry No. 200 at 121-123, 128; Docket Entry No. 199 at 197-198). McKissack also worked as a maintenance and repair worker

17

2 in September, 2003, due to an injury to Michael Clouse, a maintenance and repair leader 2 who is white. McKissack worked 136 days "out-of-class" that year in the maintenance and repair leader 2 positions without a promotion. When McKissack applied for the promotion to this position and after the interviews, MWS awarded this position to Chip Farrell, a white employee whom McKissack considered to be pre-selected for the position. (Docket Entry No. 200 at 116-118, Plaintiffs' Exhibit 2).

As to higher pay for "out-of-class" assignments, Anthony Waggoner, a black employee, worked as utility maintenance supervisor on an "out-of-class" basis. (Docket Entry No. 210 at 96). Yet, Waggoner did not receive the higher pay for this position until Plaintiff Grant, his supervisor at the time insisted on Waggoner being paid at the higher pay level of that position. Id. Plaintiff Tucker, who has worked in MWS collections since 1997 applied in March 2002, for the position of application technician, a collection position in MWS's billing and collections department. Tucker worked in this position on an "out-of-class" basis for four years without receiving a promotion or "out-of-class" pay. Tucker was deemed qualified for the position and was interviewed, but MWS awarded the position to Cindy McCullough, a white employee who was unable to satisfactorily perform the job and was removed from the position due to poor performance. (Docket Entry No. 199 at 182-184, 186). After McCullough's removal, Tucker filed a grievance and described her work on "out-of-class" status in the position that was awarded to McCullough. After filing her grievance, Tucker received "out of class" pay for a six-month period based upon her "out-of-class" work. Id. at 188-189, Plaintiffs' Exhibit 43 and Defendant's Exhibit 100.

In 1994, Plaintiff Derrick assumed the duties of the public information officer who left MWS. (Docket Entry No. 200 at 176-178; Plaintiffs' Exhibit 99). Although Derrick assumed

18

the public information officer's duties, Derrick was paid substantially less, approximately
$28,000.00 per year. (Docket Entry No. 200 at 174-75, 178). As a result of an audit, Derrick's
title was changed to public information representative I in 1995. Id. at 174-175. Derrick
continued to perform public relations work up until 2001 when MWS posted a public
information service officer position. At that time, Derrick was making approximately
$29,500.00 and the posted position had a salary increase of approximately $20,500.00. Yet,
Derrick did not apply because she was told by employees at MWS that the Director Potter
wanted a public relations person from outside with more experience and possibly from a public
relations firm. Id. at 199-201. MWS offered the position to an outside person who had worked
in public relations, but the person never accepted the position. Id. at 201-202.

Shortly thereafter, a position was posted for a special assistant to the MWS director, at a
higher pay scale. Id. at 202. Derrick did not apply again, however, because she was told that the
position was not for her. Id. at 203-204. MWS awarded the position to Sonia Harvat, a white
employee, who worked at Metro's Department of Public Works, not MWS. Based on Derrick's
personal knowledge, Harvat, a biologist, lacked any experience in public relations or with MWS.
Id. This position included public relations duties and Derrick was required to train Harvat in
those public relation duties. Id. at 208-209. Harvat did not testify at trial.

### e. Plaintiffs' Promotion Experiences

Plaintiffs also described their personal experiences with promotion decisions at MWS.
As to Plaintiff Grant, in September 1973, Grant was a utility plant helper. (Plaintiffs' Exhibit 92;
Docket Entry No. 199 at 45). In 1976, Grant was promoted to maintenance and construction
leader supervising a crew of laborers in the field with routine maintenance around the treatment
plant. In 1981, Grant was promoted to senior maintenance and construction leader. (Plaintiffs'

19

Exhibit 92). In 1983, Grant was promoted to supervising maintenance and construction leader. (Docket Entry No. 199 at 61). In 1986, Grant was promoted to assistant mechanical supervisor. (Plaintiffs' Exhibit 92).

In the 1980s, Grant also applied for the position of assistant superintendent for construction and repair on numerous occasions. Although Grant applied and was deemed qualified with a Number 1 ranking on MCSC's eligibility register, but after several interviews Grant did not receive the position. After complaining to the mayor, Grant finally received the promotion in 1990. (Docket Entry No. 199 at 61-63; Plaintiffs' Exhibit 92). In 1993, Grant's position of assistant superintendent of construction and repair was reclassified as assistant manager of System Services. (Plaintiffs' Exhibit 92). In 1998, Grant was promoted to administrative services manager of Combined Sewer Overflow ("CSO"), a new section at MWS. Grant was transferred to Engineering in 1999, but retained his title. (Plaintiffs' Exhibit 92). Despite Grant's efforts to advance further into upper management, MWS has not promoted him since 1998. (Docket Entry No. 199 at 49, 54-55; Plaintiffs' Exhibit 92).

In April 2002, the Stormwater Division was moved to MWS from the Metro Department of Public Works ("DPW"). (Docket Entry No. 199 at 77-78). Potter awarded the position of new assistant director in MWS' Stormwater Division to Tom Palko an engineer at DPW who is white. Approximately two months after Stormwater moved to MWS, Grant received an e-mail from Potter, dated June 14, 2002, stating that Potter and Palko, the interim assistant director for the Stormwater Division wished to speak with Grant regarding "opportunities" in Stormwater. (Plaintiffs' Exhibit 32; Docket Entry No. 199 at 76-77). Within the next few days, Grant met with Potter, who told Grant of some "job opportunities" for him in Stormwater that Potter

thought Grant could perform. Potter referred Grant to Palko to decide which jobs in Stormwater Grant wanted. <u>Id.</u> at 79.

Shortly thereafter, Palko arrived and Potter instructed Palko to "take Slim [Grant] down and show him these jobs that we have for him because of his knowledge and experience." <u>Id.</u> at 80. Grant then went to Palko's office and Palko provided Grant with a document titled "Metropolitan Nashville and Davidson County, TN Stormwater Program and Organizational Study performed by AMEC ("AMEC Study"). Palko asked Grant to review the AMEC Study and then contact him about the positions that Grant could perform. <u>Id.</u> at 80; Plaintiffs' Exhibit 170). After reviewing the AMEC Study, Grant identified several open positions, including program director, administrative support manager, and remedial maintenance manager of NPDES permits. (Docket Entry No. 199 at 82-85).

Grant thereafter repeatedly tried to contact Palko about these positions. After some delay, Grant spoke with Palko who responded that Grant's current pay grade was "too high," to be placed in any Stormwater management position. Grant was confused by Palko's response given that Potter and Palko knew Grant's position and pay level when Potter first approached him about job opportunities in Stormwater management. <u>Id.</u> at 85-86, 91. Grant was not awarded any of these positions in the Stormwater Division. Several months later in 2003 after Palko's statement that Grant's classification was "too high," Grant learned that several Stormwater management positions identified in the AMEC Study, were posted at the same or higher pay classification than Grant's. <u>Id.</u> at 88.

MWS hired Plaintiff Reid as a customer service representative on July 1, 1990. (Plaintiffs Exhibit 100). In August 1992, Reid and other customer service representatives were reclassified and given the title of senior customer service representative. (Docket Entry No. 202

at 98-99).  In July 1993, Reid's position was reclassified based on a pay plan adjustment.  Id.

For almost eleven (11) years, Reid did not receive a promotion.  As a result of a settlement in a

prior race discrimination action, Reid was promoted to the position of administrative assistant 2

and transferred to MWS's engineering division in June 2001.  (Plaintiffs' Exhibit 100; Docket

Entry No. 202 at 101-102).  In 2001, Reid also applied for the customer service supervisor lobby

and cash position that MWS awarded to Christie Binkley, who was ranked first of the applicants.

Nine months after her promotion, Binkley was removed from that position for unacceptable

performance.  After the filing of this action, Reid received her second promotion in 2005, to the

position of administrative service officer 3.  Id. at 96.  Reid has not received any promotions

since.

Plaintiff McKissack, a black male, has a high school diploma, two (2) years of college

and certifications in welding and mechanics as well as a commercial driver license ("CDL").

(Docket Entry No. 200 at 109).  MWS hired McKissack on February 1, 1990 as a meter reader

trainee.  Approximately six months later, McKissack's classification was changed to meter

reader.  Id.  In 1993, McKissack's job classification changed again to meter reader 1 and in 1994

to meter reader 2 until 1996 when MWS reclassified his job as customer service field

representative 2.  (Plaintiffs' Exhibit 97).  After approximately nine years of employment,

McKissack received his first promotion on January 4, 1999, to the position of paint and body

repair.  Following a demotion in 2000,[5] McKissack was placed in the maintenance and repair

---

[5] Although not relevant to the Court's determination of liability based on disparate impact,
McKissack asserted in this action that he was discriminated against in discipline and treated
more harshly than similarly situated white employees.  Specifically, McKissack was demoted for
"dishonesty" because he was working on a private vehicle in the body shop after working hours.
By contrast, white employees were allowed to perform work on personal vehicles in the body
shop and were not disciplined.  (Docket Entry No. 200 at 123-131).

Case 3:04-cv-00630   Document 237   Filed 07/22/10   Page 22 of 72 PageID #: 8166

worker 1 position in MWS's System Services division. In January 2004, McKissack's classification was changed to water maintenance technician 3. (Plaintiffs' Exhibit 97).

Plaintiff McKissack applied for maintenance and repair leader 2 positions and after the interview, McKissack was ranked number one on the MCSC eligibility register, followed by white employee Glenn Word, number two, and Michael French, a white employee. MSW did not award the position to McKissack, but gave a second test and conducted a second interview. French was not required to take a second test or a second interview, as did McKissack. After the second interview, Michael French was ranked number one, McKissack number two and Word Number three. MWS awarded the position to French. (Docket Entry No. 200 at 118-121). Two years after the filing of this action, McKissack was promoted to maintenance and repair leader 2 in March 2005. In February 2008, McKissack was promoted to water maintenance supervisor. Id. at 110-111. McKissack attributes those promotions to his filing of this action.

Plaintiff Martindale, a black female high school graduate, has some college classes and a certificate from clerical word processing school. (Docket Entry No. 201 at 107). Martindale worked at Metro for approximately 16 years and transferred to MWS on July 13, 2000 to the position of customer service representative 2. Id. at 107; Plaintiffs' Exhibit 94. In July 2001, Martindale's position was reclassified due to a pay plan adjustment as office support representative 2. (Plaintiffs' Exhibit 94, Docket Entry No. 201 at 111-112). In February 2002, Martindale applied for three office support positions because she was already performing many of the same duties as other office support 3 employees who are white. Martindale applied, was found qualified, and ranked number one on the MCSC's eligibility register. MWS interviewed Martindale for the position, but did not fill the position that remained unfilled for over a year. Id. at 121-124. Although the position had just been posted, Martindale was told that the position

was not needed at that time. Id. at 123-124. Martindale did not receive the customer service representative 3 position until July 2003, after complaining about MWS' failure to promote her. Id. at 41.

Plaintiff Tucker is a black female with a high school diploma and some additional college courses. (Docket Entry No. 199 at 174). MWS hired Tucker in 1985 for the position of typist clerk 1 in its customer service division. Tucker has worked her entire career in MWS's customer service division and was promoted to customer service representative in 1989. Tucker's position was reclassified to customer service representative 3 in 1993 and again reclassified in July 2001 to office support representative 3. Tucker has not received a promotion since 1989. (Plaintiffs' Exhibit 98). After several promotions, Tucker currently serves as an office support 3 employee in MWS's billing department.

In 2001, Tucker applied for a supervisor position in customer service. (Docket Entry No. 199 at 185). Although Tucker was qualified, she was not interviewed. MWS awarded the position to Judy Ward, a white employee with less seniority than Tucker and similar experience. Id. at 189-190. Tucker applied for other promotions, including a supervisor position that was given to another white employee, Cecelia Aguilar, with about the same seniority and experience as Tucker, but Aguilar asked Tucker for assistance to do the job. Id. at 198. Tucker described a promotion for which she applied that was given to Lisa Russell, a white employee. Id. at 186-87. Based upon her observations during her 23 years at MWS, Tucker opined that blacks have a more difficult time advancing as compared to their white counterparts.

Helen Andrews, a black female with a high school diploma and three years of college, has also taken additional education classes through MWS. (Docket Entry No. 210 at 175). Andrews has worked at MWS for approximately 20 years and applied for at least 12 positions,

id. at 187, but has received only 3 promotions.  Id. at 178.  Andrews also testified that in her experience, positions were "tailored" for the people that MWS had in mind for the promotion, and she became frustrated with the interview process during her tenure at MWS.  (Docket Entry No. 210 at 186-88).

Although some Plaintiffs testified as to disparate job assignments and discipline, without statistical or comparable data, the Court cannot find disparate impact on MWS black employees based upon MWS's practices on discipline and job assignments (other than out-of-class assignments).

### 3. The Parties' Expert Proof

For their disparate impact claims, Plaintiffs' expert was Dr. Michael Moomaw, the regional director of Applied Psychological Techniques, Inc., who holds a Ph.D. degree in industrial and organizational psychology from Georgia Institute of Technology.  Dr. Moomaw works in the area of industrial psychology and human resources management, focusing on the development and validation of employee selection procedures.  Dr. Moomaw has consulted with businesses on job analysis, personnel assessment, employment testing, performance management, and measurement for businesses, including top 500 firms.

### a.  Dr. Moomaw's 2004 Analyses

To determine whether disparity exists between black and white employees in job placement, promotions and pay, Dr. Moomaw reviewed and analyzed: 1) MWS reports from 2000-2004 outlining MWS' racial composition; 2) Pay Plans covering positions at MWS; 3) job descriptions for MWS jobs; and 4) employee history data for employees during the relevant period, such as positions held and salary grades.  (Docket Entry No. 201 at 14-15).  Dr. Moomaw also reviewed MWS data for all employees from 2000 through 2004 and on the following

25

subjects: (1) employee history data; (2) EEOC State and Local Government Information (EEO-4) Bi-Yearly Reports for the Metro Water Services Department; (3) monthly reports from Metro Water showing the racial composition of the department from June 2002 through August 2002; (4) Metro Water applications report through October 2004 from the applicant tracking system for the named Plaintiffs; (5) charts containing information regarding charges of discrimination filed by Metro Water employees; (6) organizational charts for Metro Water; (7) graphs showing "Charges by Month", "Disciplinary Action Demographics", also a "List of Employees Disciplined" for 2002-03, 2003-04 and 2004-05; and (8) Metro Water job descriptions.

For the MWS job positions identified, Dr. Moomaw established the following categories: (1) FLSA Status (exempt vs. nonexempt); (2) EEO Function (based on specific job functions or types used in government reports, such as EEO-1; (3) Salary Type (based on Metro Water Pay Plans); and (4) Pay Grade (based on Steps within each pay range). Id. at 15-19. In Dr. Moomaw's view, these groups were of similar and comparable jobs reflecting experience and seniority.

As to FLSA Status, Dr. Moomaw's 2004 analyses reflect statistically significant differences between white and black employees based on the FLSA status. Dr. Moomaw's analyses showed significantly fewer black employees held positions categorized as "exempt" under the FLSA, in each year from 2000 to 2004, as compared to white employees. The results were that only 8.8% to 11.3% of black employees held positions categorized as FLSA "exempt" during the years 2000 through 2004, while 21.2% to 23.6% of white employees held positions categorized as FLSA "exempt" during the same period. Conversely, a significantly greater percentage of black employees held non-exempt positions under FLSA compared to white employees in each year. The percentages ranged from 88.70% to 91.20% for black employees

versus 76.40% to 78.80% for white employees. Black employees typically held non-exempt, hourly positions across all years. Id. at 18-19. Dr. Moomaw's findings reflect "significant differences between ethnic groups, particularly white and black employees, based on the FLSA status of the positions or jobs held by employees in each group." (Plaintiffs' Exhibit 1, Moomaw 2004 Report at 6).

As to EEO Function, Dr. Moomaw's analyses found that a significantly greater percentage of black employees held jobs in the Service Maintenance EEO Function in each year from 2000 through 2004 compared to white employees. The percentages ranged from 30.50% to 39.20% for black employees, compared to 12.80% to 18.70% for white employees. Also, for the years 2001 through 2004, a significantly smaller proportion of black employees compared to white employees held positions classified in the Professional and Technician EEO Functions. For the professional function, the percentages ranged from 6.00% to 7.40% for black employees, versus 13.00% to 15.70% for white employees. For the technician function, the percentages ranged from 4.70% to 10.20% for black employees, compared to 12.20% to 17.30% for white employees. Finally, in 2000, a significantly smaller proportion of black employees held positions in the Administrative Support EEO Function Id. at 20.

The significantly smaller proportion of black employees than white employees held Professional, Technician, and Administrative Support EEO functions is reflected in Dr. Moomaw's summary as follows:

| Service Maintenance EEO Function | | |
|---|---|---|
| | **Percentage of White Employees** | **Percentage of Black Employees** |
| **2000** | 18.7% (83 out of 444 employees) | 39.2% (49 out of 125 employees) |
| **2001** | 16.3% (79/484) | 31.5% (47/149) |

27

| 2002 | 14.7% (74/502) | 35.6% (62/174) |
|------|----------------|----------------|
| 2003 | 14.2% (72/508) | 34.9% (58/166) |
| 2004 | 12.8% (65/506) | 30.5% (51/167) |

### Professional EEO Function

|      | Percentage of White Employees | Percentage of Black Employees |
|------|-------------------------------|-------------------------------|
| 2000 | 14.9% (66/444) | 8.0% (10/125) |
| 2001 | 14.7% (71/484) | 7.4% (11/149) |
| 2002 | 15.7% (79/502) | 6.9% (12/174) |
| 2003 | 13.0% (66/508) | 6.0% (10/166) |
| 2004 | 13.2% (67/506) | 6.6% (11/167) |

### Technician EEO Function

|      | Percentage of White Employees | Percentage of Black Employees |
|------|-------------------------------|-------------------------------|
| 2000 | 13.7% (61/444) | 6.4% (49/125) |
| 2001 | 12.2% (59/484) | 4.7% (7/149) |
| 2002 | 15.9% (80/502) | 8.0% (14/174) |
| 2003 | 17.3% (88/508) | 8.4% (14/166) |
| 2004 | 12.8% (65/506) | 10.2% (17/167) |

### Administrative Support EEO Function

|      | Percentage of White Employees | Percentage of Black Employees |
|------|-------------------------------|-------------------------------|
| 2000 | 10.4% (46/444) | 2.4% (3/125) |
| 2001 | 20.5% (99/484) | 18.8% (28/149) |

| 2002 | 19.3% (97/502) | 14.4% (25/174) |
| 2003 | 22.2% (113/508) | 15.7% (26/166) |
| 2004 | 20.6% (104/506) | 15.6% (26/167) |

Id. at Table 2 to Plaintiffs' Exhibit No. 1.

The Salary Types based on Metro pay plans include Trades and Labor Schedule ("TLS"), Standard Range Schedule ("SR"), Public Safety ("PS") and Special Pay Types, such as Directors. TLS positions are those with primary duties involving physical work which require knowledge or experience of a trade, craft, or of a manual-labor nature. TLS has three (3) separate sub-schedules or sub-types: a) TG - which contains "positions with worker responsibility;" b) TL - which contains "positions with lead responsibility;" and c) TS – which contains "positions with supervisory responsibility." SR positions are those, even if physical work is required, with a primary duty that "requires knowledge or experience of an administrative, clerical, scientific, artistic, or technical nature not related to trade, craft, or manual-labor work." (Docket Entry No. 201 at 16-17).

For Salary Type, Dr. Moomaw's analyses showed a significantly greater percentage of black employees held positions classified in the TG salary type (positions without lead or supervisor responsibilities) of the Trade and Labor Schedule in each year compared to white employees. The percentages ranged from 33.50% to 37.70% for black employees, compared to 18.20% to 23.90% for white employees. The TG salary type includes positions with "worker responsibility" involving the performance of physical work that requires knowledge of, or experience in a trade, craft, or manual-labor nature. The results here revealed significantly fewer black employees held positions classified in the SR salary type in each year from 2000 to 2004

29

compared to white employees. The percentages ranged from 35.50% to 39.90% for black

employees to 52.70% to 55.80% for white employees. The SR salary type includes jobs such as

Biologist, Fleet Manager - Heavy Equipment, and Special Projects Manager. Id. at 21-22.

Dr. Moomaw found that "in almost all cases, a greater number or proportion of [African-

Americans] held positions at lower pay grades in all Salary Types than white employees holding

positions in the same Salary Types." (Plaintiffs' Exhibit No. 1at 7). In 2000, Dr. Moomaw

noted that approximately 68% of black employees and approximately 37% of white employees

holding positions in the TG salary type were in lower pay grades 2-6, but 63% of white

employees and 32% of black employees in the TG salary type were in higher pay grades 7-13.

Id. at 8. "[W]ith few exceptions," Dr. Moomaw found that "this trend was . . . consistent across

years and salary types." Id. at 8. For the TS salary type, the number of black employees who

held positions in the salary type between 2000 through 2004 was from five (5) to ten (10). The

relatively small changes in the pay grades for a group impacts on the group's percentages, but

black employees typically held jobs in lower pay grades for other salary types from 2000 through

2004. Id. at 23-24. A summary of Dr. Moomaw's findings as to pay grades is as follows:

| TG Salary Type | | | |
|---|---|---|---|
| | **Pay Grade** | **Percentage of White Employees** | **Percentage of Black Employees** |
| **2000** | **2-6** | 37.30% | 67.65% |
| | **7-13** | 62.70% | 32.35% |
| **2001** | **2-6** | 26.00% | 54.00% |
| | **7-13** | 74.00% | 45.90% |
| **2002** | **2-6** | 23.60% | 48.60% |

| | Pay Grade | Percentage of White Employees | Percentage of Black Employees |
|---|---|---|---|
| | 7-13 | 76.50% | 51.50% |
| 2003 | 2-6 | 25.00% | 41.30% |
| | 7-13 | 75.10% | 58.70% |
| 2004 | 2-6 | 19.90% | 45.20% |
| | 7-13 | 80.30% | 54.80% |

**TL Salary Type**

| | Pay Grade | Percentage of White Employees | Percentage of Black Employees |
|---|---|---|---|
| 2000 | 6-9 | 47.79% | 80.65% |
| | 10-14 | 52.21% | 19.15% |
| 2001 | 6-9 | 44.20% | 72.00% |
| | 10-14 | 58.80% | 28.00% |
| 2002 | 6-9 | 43.40% | 71.70% |
| | 10-14 | 56.50% | 26.30% |
| 2003 | 6-9 | 37.20% | 71.00% |
| | 10-14 | 62.80% | 29.00% |
| 2004 | 6-9 | 38.30% | 70.30% |
| | 10-14 | 61.80% | 29.70% |

**TS Salary Type**

| | Pay Grade | Percentage of White Employees | Percentage of Black Employees |
|---|---|---|---|
| 2000 | 8-10 | 52.20% | 60.00% |

| | 11-13 | 47.80% | 40.00% |
|---|---|---|---|
| **2001** | **8-10** | 51.20% | 60.00% |
| | **11-13** | 47.80% | 40.00% |
| **2002** | **8-10** | 30.00% | 62.50% |
| | **11-13** | 70.00% | 37.50% |
| **2003** | **8-10** | 31.00% | 30.00% |
| | **11-13** | 69.00% | 70.00% |
| **2004** | **8-10** | 35.50% | 20.00% |
| | **11-13** | 64.60% | 80.00% |

### SR Salary Type

| | Pay Grade | Percentage of White Employees | Percentage of Black Employees |
|---|---|---|---|
| **2000** | **1-7** | 51.00% | 74.20% |
| | **8-15** | 48.00% | 25.70% |
| **2001** | **1-7** | 39.20% | 69.10% |
| | **8-15** | 60.80% | 30.70% |
| **2002** | **1-7** | 29.90% | 62.90% |
| | **8-15** | 70.10% | 37.00% |
| **2003** | **1-7** | 28.90% | 60.50% |
| | **8-15** | 71.10% | 39.50% |
| **2004** | **1-7** | 27.10% | 72.90% |
| | **8-15** | 55.50% | 44.40% |

(Plaintiffs' Exhibit 1 at Table 3 thereto).

Dr. Moomaw deemed these differences significant in that the "[g]reater numbers or proportions of [African-American] employees tend to be in positions that are predominately 'manual labor' positions, covered by the TG salary type, and lower pay grades within each salary type." (Plaintiffs' Exhibit 1 at 8). Based upon his analyses, Dr. Moomaw concluded that "a significantly smaller proportion of [African-American] employees are represented in exempt positions, positions classified in the Professional and Technical EEO Functions, positions in the SR salary type that includes professional and manager positions, and positions in higher pay grades within almost all salary types." Id. Although MWS utilizes Metro pay scales for Salary Type and Pay Grade, the actual decision-making process in classifying a MWS employee within a particular Pay Grade is by MWS without any formalized criteria. MWS's pay plan has particular "Salary Grade" with "Steps," or incremental increases in pay with the Salary Grade. Dr. Michael Moomaw found that from 2000-2006, black employees consistently were in the lower "steps" within each pay grade, when compared to white employees, who were consistently paid in the higher "steps" within each pay grade.

In sum, the results of Dr. Moomaw's 2004 analyses reveal stark and significant differences in representation between white and black employees that extend to all categories of MWS's positions whether based on FLSA Status, EEO Function, Salary Type, and Pay Grade within Salary Type. Specifically, the results prove that black employees are significantly underrepresented compared to white employees in FLSA "exempt" positions, in the professional and technician positions based upon EEO Functions, positions in the SR Salary Type, and positions in higher pay grades within all Salary Types, except TS. Conversely, greater numbers or proportions of black employees work in positions that are predominately "manual labor"

covered by the TG salary type and at lower pay grades within each salary type. The results were consistent across the years 2000 through 2004. Id. at 26. According to Dr. Moomaw, these figures reflect significant limitations on MWS's black employees' opportunities for advancement and increased salaries. Id. at 27.

### b. Dr. Moomaw's 2007 Analyses

In his 2007 analyses, Dr. Moomaw examined additional MWS data from 2004 through October 11, 2006 for further analyses and additional findings. Dr. Moomaw first repeated his 2004 analyses utilizing the additional data for January 2000 through October 11, 2006. In his original report, Dr. Moomaw evaluated the racial composition or ethnic representation in various positions within MWS. These analyses were once again directly related to the job assignments and promotions and the number of black and white employees in positions based on FLSA status (exempt, nonexempt), EEO Function (for example, Administrative Support, Professional functions), Salary Type (including SR, TG, TL, and TS), and Pay Grade. Id. at 13, 27. According to Dr. Moomaw, the results of the 2007 analyses provide the percentage of black and white employees in jobs classified at the various levels or categories in the variables described above and the results relate directly to the question or issue of job assignment relevant to this litigation. Id. at 29.

As to FLSA status, Dr. Moomaw's 2007 analyses found statistically significant differences between black and white employees based on the FLSA status. Specifically, significantly fewer MWS black employees held positions categorized as FLSA exempt in each year from January 2000 through October 11, 2006 compared to MWS white employees. Only 4.52% to 6.88% of black employees held FLSA exempt positions from 2000 through 2006, as compared to 13.87% to 17.43% of white employees in such "exempt" position for the same

years. In contrast for FLSA non-exempt positions, 87.62% to 94.80% for blacks held such position compared to 78.00% to 83.40% of MWS's white employees. Yet, significant differences were not found in the percentage of black and white employees holding management level jobs after 2005 when only one or two black employees were in positions classified as "management" positions. In 2005, the number of black and white employees increased in both groups for jobs in the "management" category. Yet, the trend identified in the 2004 analyses continued through 2006 in that fewer black employees held FLSA exempt jobs than white employees and blacks held more non-exempt jobs at MWS than its white employees. Id. at 30.

For EEO Function data, Dr. Moomaw's 2007 analyses found a significantly greater percentage of black employees in the service maintenance EEO Function job for each year from 2000 through 2006 compared to white employees. The percentages of African- American employees in these jobs were 29.95% to 47.92% compared to 17.44% to 21.49% for MWS's white employees. A significantly smaller percentage of black employees 5.08% to 7.64% held positions in the professional function for the period 2000 through 2006 compared to MWS's white employees who held 13.81 % to 16.36% of such jobs. Utilizing the technician data for 2000 through 2003, black employees held 3.49% to 8.00% of such positions, but MWS's white employees held 12.08% to 16.37%. From 2003 through 2006, in the Water Service Maintenance black employees held from 6.86% to 9.14% of such jobs, but MWS's white employees held 1.85% to 2.67% of such jobs.

According to Salary Type data in his 2007 analyses, Dr. Moomaw cited a significantly greater percentage of black employees in positions for each year within the TG salary type (involving manual labor, physical work with some trade or craft experience) with black employees holding  percentages from 34.1% to 38.42%, compared to 18.66% to 24.29% for

MWS's white employees. Dr. Moomaw's 2007 results parallel his 2004 analyses for each year and show significantly fewer black employees holding positions classified in the SR salary (includes jobs such as Biologist, Fleet Manager - Heavy Equipment, Special Projects Manager) compared to white employees. The percentages ranged from 32.56% to 42.08% for black employees, compared to 52.40% to 54.91% for white employees. Finally, a significantly greater percentage of blacks held positions in the TL salary type in the year 2000. Id. at 32-33.

As to pay grade within a salary type, the results of Dr. Moomaw's 2007 analyses reflect that in almost all cases, a greater percentage of blacks held positions at lower pay grades in almost all salary types compared to white employees holding positions in the same salary types. For example, in the year 2005, approximately 43% of the black employees and approximately 17% of white employees holding positions in the TG salary type were in lower Pay Grades 2 through 6. Conversely, approximately 83% of white employees and approximately 57% of black employees holding positions in the TG salary type were in Pay Grades 7 through 13. With the exception of the TS salary type, this trend was found to be consistent across years and salary types, similar to the results found in 2004. For the TS salary type, beginning in 2003 and continuing to 2006, a greater percentage of black employees held positions at higher pay grades than white employees. Dr. Moomaw noted, however, than the number of African-Americans in the TS salary type is small, ranging from nine (9) to twelve (12). As a result, individual changes could have a significant impact on the percentages. However, as in 2004, the results show that blacks typically hold jobs in lower pay grades for most other salary types. Id. at 33-34.

In addition, Dr. Moomaw conducted analyses based on job groupings and progressions. According to his review of MWS' compensation system, a wide variety of jobs are grouped into a common salary type and pay grade regardless of the lack of similarity in the work performed or

the requirements of the jobs. For example, Pay Grade 10 in the SR salary type in 2004 includes dissimilar positions such as Administrative Services Officer 3, CADIGIS Analysis 2, and Chemist 2. The functions of these jobs and their entry requirements are different based on the MWS job descriptions.

Based on the diverse jobs included in each of the MWS salary types and pay grades, Dr. Moomaw opined that analyses at the salary type and pay grade levels alone were inappropriate because to do so would present an incomplete picture. As a result, Dr. Moomaw created rational job groupings based on information in the MWS job descriptions, organizational charts, and salary plans. These job groupings were formed based on the similarity of work performed in the jobs and a review of the requirements of the jobs, such as, education or experience. Afterwards, Dr. Moomaw organized the jobs within each group according to their salary type and pay grade. Similar jobs were grouped in this manner to represent job progressions where it is assumed that employees would move from level to level and as such, from pay grade to pay grade. In many cases, the job progressions include the supervisory and manager level jobs in the progression, meaning that jobs in some progressions span different salary types. Id. at 36-37.

Dr. Moomaw concluded that examining promotion rates alone, as did Dr. Paul White, MWS's expert, presents an incomplete picture in comparing the advancement of blacks and whites. For example, the advancement rates of both groups could be high or low and not significantly different. Yet, MWS data shows that during the relevant time period, blacks typically held positions in lower pay grades within all salary types, except TS. As such, their promotions would be into jobs lower in the job progression or more precisely, jobs at lower levels with lower salaries, as compared to the promotions of white employees. This is a significant issue in assessing the promotion rates of the respective racial groups because it would

37

negatively impact both salary and future advancements. Thus, Dr. Moomaw concluded that his analyses of representation of blacks and whites in the various progressions from year to year provide a much more accurate picture of the job assignments and opportunities for advancement of black and white employees. Id. at 38.

Based on his analyses of job groupings, individual jobs in each salary type, pay grade, and the number of blacks and whites employees in each, Dr. Moomaw concluded that during the years 2000 through 2006, blacks have been placed into certain jobs and job progressions, such as building maintenance, customer service, industrial maintenance, more often than MWS's white employees. Further, in examining job progressions, Dr. Moomaw's analyses also found that blacks hold jobs at lower pay grades in the progression and slower movement into higher level jobs, including supervisory or management jobs, has been limited. Dr. Moomaw's examples include the building maintenance position where the progression consists of custodian (TG-5 salary type and pay grade) and building maintenance leader (TG-6). With the exception of a single white employee in 2000 and 2001, blacks held all of these jobs from 2000 to 2006.

Another example is customer service where after 2000, the progression includes customer service field representative 1, 2, 3 (SR-5, 6, 7), customer services supervisor (SR- lo), customer service assistant manager (SR-12), and customer service manager (SR-14). Blacks primarily held customer service field representative jobs (working in the field), and until 2005, a majority of black employees were in the SR-5 and SR-6 level jobs. Prior to 2004, a majority of white employees held jobs at the SR-7 level. However, the data also shows that there were not any black customer service supervisors until 2006 and there were not any black customer service assistant managers during the period of 2004 through 2006.

Another example is in industrial maintenance, where the progression consists of maintenance and repair worker 1,2, 3 (TG-3, 4, 6); maintenance and repair leader 1, 2 (TL-7, 9); industrial electrician 1, 2 (TG-12, TL-12); industrial mechanic 1, 2 (TG-11, TL-11 or TL-14 in 2006); industrial electronics technician 1, 2 (TG- 13, TL- 13); industrial technician master (TL-14); industrial maintenance supervisor 1, 2 (TS -1 2, TS- 13). Black employees predominately occupy maintenance and repair worker or maintenance and repair leader jobs. Black employees are underrepresented in more skilled positions (*e.g.*, industrial electrician, industrial mechanic and industrial maintenance supervisor jobs).

According to Dr. Moomaw, the engineer position has the progression of engineer technician 1, 2, 3 (SR-6, 8, 10) and engineer 1, 2, 3 (SR-12, 13, 14). Black employees only held engineering technician jobs until 2004 when one (1) black employee held an engineer job. Black employees did not hold any engineer-in-training jobs until 2006. In the water maintenance position, black employees represented approximately 67% of the employees in the progression in 2006. The water maintenance technician jobs have a progression range from TG-3 to TG-6 and the water maintenance leader job ranges from TL-7 to TL-9. The information systems has jobs in the progression range from SR-8 to SR-14. Black employees did not hold any jobs in this progression during the period 2000 through 2006. Id. at 39-41. According to Dr. Moomaw, these examples are not exhaustive, but demonstrate a notable trend during the period 2000 through 2006.

Based on the results of these analyses, Dr. Moomaw concluded that the representation of black employees in the various jobs and lower pay grades certainly impacted salaries and opportunities for advancement of MWS's black employees. To illustrate his point, race was correlated with salary for each year to determine if there, in fact, was a general relationship

between salary and race. The results show a significant relationship between salary and race for all salary types, except TS, across all years. The correlations establish that salaries of blacks tend to be lower than the salaries of whites in all salary types, except TS, during the years 2000 through 2006. Id. at 41.

While MWS argues that blacks were not better represented in certain jobs or job progressions because they did not meet the requirements or minimum qualifications for the jobs, Dr. Moomaw testified that critical questions existed as to how such decisions were made and what information was used to make the decisions. For example, his review of the job descriptions provided in 2004 reflect that many jobs have specified qualifications or requirements, such as education or experience, but it is unclear how these minimum qualifications were established, validated or whether these qualification were applied consistently to all individuals. The testimony of MWS employees establishes that minimum qualifications were added, altered or deleted arbitrarily by MWS with the effect of promoting MWS's white employees.

Dr. Moomaw also testified that many of the job descriptions also included the statement "[m]ore specific degree, certification, and experience requirements may be included on the position announcement as vacancies occur." (Docket Entry No. 201 at 42). According to Dr. Moomaw, this statement suggests that requirements can be changed or added when job openings are posted, as supported by the testimony of MWS employees. Id. at 42-43. According to Dr. Moomaw, the requirements may not actually be necessary to perform the job, in which case, otherwise qualified people are eliminated unnecessarily from consideration. Id. at 43. In Dr. Moomaw's view, these requirements are structured to be applied inconsistently and changed to fit a specific candidate or candidates for the job. Id. at 42-43. This practice is inappropriate and

may result in otherwise qualified individuals being unnecessarily eliminated from consideration. Id.

Dr. Moomaw testified that another issue with the requirements or minimum qualifications used in the employment decision-making process at MWS relates to the possibility or use of equivalent standards. If blacks do not in fact meet the minimum qualifications for a job, it is possible that equivalent qualifications could be established. For example, experience in a given job could be used in lieu of a specific education or degree requirement. In many instances, this may afford black employees an opportunity to move into the higher level jobs or other job progressions. Id. at 42. In addition, MWS's selection procedure, particularly the interviews may also account for the racial disparities cited in his report. Id. at 43.

In conclusion, Dr. Moomaw testified that consistent with his original 2004 results and their replication in 2007, a significantly smaller percentage of black employees are represented in exempt positions, positions classified in the Professional and Technician EEO functions, positions in the SR salary type that includes professional and manager positions, and positions in higher pay grades within almost all salary types. Further, Dr. Moomaw testified that the opportunity for black employees to be promoted, or to earn more, has been limited due to their job assignments and the results of his analyses reflect that black employees have been "slotted" or placed into jobs where the opportunity for promotion into higher level jobs and increased pay have been limited. Id. at 44.

On cross-examination, Dr. Moomaw admitted that he reviewed pay plans and job descriptions, id. at 61, as well as employee history data, id. at 62, but did not review specific applicants for a particular job. The EEO function utilized by Dr. Moomaw was listed on MWS's job description. Id. at 64. Dr. Moomaw's analysis did exclude 61 MWS employees because

41

their job descriptions did not match the job titles of those positions and information was missing about those jobs. Id. at 64, 66. Dr. Moomaw deemed educational requirements and qualifications to be relevant, but an issue existed as to what the qualifications mean at MWS. Id. at 82. Dr. Moomaw did not review the MCSC rules nor consider experience and seniority for promotions. Id. at 82. The issue here is how these rules are applied and under those rules, MWS participates in writing job descriptions, announcements, conduct and controls the interview process for promotions. Moreover, Plaintiffs identified positions where white employees with less educational levels, seniority and experience than black applicants were promoted over those black applicants.

As to promotions, Dr. Moomaw testified that he did not find any overall racial difference in the total of all promotions at MSW, id. at 97, 102, but explained: "the critical issue is what jobs people are being promoted into." Id. at 96. In Dr. Moomaw's view, black employees at MWS have a "glass ceiling" on their promotion opportunities. Id. at 99. As to MWS contention that altering job requirements increases the pool of black applicants, Dr. Moomaw responded that this practice should produce more "favorable outcome" of percentages of MWS black employees in higher positions at MWS. Id. at 105.

### c. Dr. White's Analysis

Dr. Paul White, Defendant's expert, who has a Ph.D from North Carolina State is the Director of ERS Group, in Washington, D.C., a consulting and research firm that analyzes various employment decisions for governmental agencies, corporations and universities. Dr. White reviewed Dr. Moomaw's analyses and analyzed MWS's employee's promotion and employee compensation levels. In Dr. White's view, an analysis of MWS's promotions show that the percentage of MWS's black employees are promoted in about the same percentage of the

black workers in MWS's workforce. As to compensation, Dr. White opined that the average compensation levels of MWS's black employees should be compared to the average compensation levels of MWS's white employees with similar experience and pay grade. In sum, Dr. White's analysis did not find any patterns of statistically significant differences between the compensation and promotion rates of black and white employees at MWS department.

According to Dr. White, his general and specific analyses, controlled for certain variables such as seniority and experience.[6] Dr. White's analysis took an annual "snapshot" for the years 2000 through 2006 of MWS's employees. Dr. White's selection pools analysis "Fischers Exact Test" "takes a group of people and compares African- Americans and white promotions from that group." Under this analysis, a comparison is made of the number of black promotions that actually occurred to the number of expected promotions. This test also measures the difference in black representation among those in a particular group who were promoted that year to the black representation in that group at the end of the previous year and to the total advancement of all black employees.

According to Dr. White, black employees actually advanced at a rate slightly greater than their representation in the workforce with black employees receiving 312 promotions and white employees 814 promotions. MWS's black employees represented approximately 28% of all of the promotions when considering the total expected promotions would be about 302 promotions. Dr. White did not find any statistically significant differences among blacks actually promoted and the number of black promotions expected to be promoted based upon MWS's total number of black employees.

---

[6]Dr. White conceded on cross-examination that his report does not describe how he accounted for these variables.

Dr. White also discussed his common odds ratio test that combines the "Fischers Exact Tests" to yield the result of all the years by pay types, and grades. According to Dr. White, this common odds ratio test results did not show any statistically significant differences in black advancements compared to their MWS white "counterparts." Dr. White also considered advancements within each pay type that should reflect 102 advancements for blacks, but MWS's black employees actually received 106 of those advancements.

Dr. White also performed a logistic regression analysis to compare similarly situated employees by creating a statistical model and controlling for certain variables. In considering pay type, SR, TG, TL, and TS Dr. White looked at year end snapshot for each year 2000 through 2006. "The only statistically significant difference occurred in 2005 in the SR pay type where African American employees had a statistically significant advantage for advancements." (Docket Entry No. 207 at 139). Dr. White also applied a test for each year, pay type and grade of the 149 different combinations of these factors, 135 did not reveal any statistically significant difference in favor of either blacks or whites, except for a handful of instances where there were statistically significantly results adverse to either whites or blacks, with six instances statistically significant results adverse to blacks, and eight instances statistically significant to adverse to whites. Id. at 140. Dr. White did find a statistical significance in a technical sense at which group of these employees had a higher average salary.

Dr. White's regression analysis of compensation evaluated a total of 28 different combinations of years and pay types to determine whether the compensation rates of employees with similar experience and seniority received similar pay regardless of their race. Of his 28 tests, Dr. White found that in 27 blacks and white employees did not have statistically significant differences in compensation with similar seniority and experience, except in 2002. Id. at 144.

44

On cross-examination, Dr. White described his review of MWS's job descriptions as "Briefly" and only as to "some of the job descriptions that [he] received." Id. at 163. For promotional announcements, Dr. White reviewed only the MCSC's announcements with "generic job descriptions, for each type of job" as "background work." Id. at 164. Dr. White did not recall if he had particular job announcements data for promotions nor did he analyze the minimum qualifications for a particular job as necessary or job-related. Id. Dr. White also assumed that all things were equal as to employees' qualifications and experiences when he examined particular job category. Id. at 166. Dr. White lacks expertise on evaluating changes to job description and did not consider a lateral transfer to be a promotion. Dr. White examined lateral transfers and found that of MWS's lateral transfers, about 30% were black employees, id. at 170, but he did not analyze whether those transfers were voluntary or involuntary nor did Dr. White consider the MWS division or section to which the individuals were transferred. Id. at 173-174.

Dr. White criticizes Dr. Moomaw's analysis of the percentages of black and white employees in various pay grades and pay types for his failure to consider new hires from outside MWS; the minimum qualifications for a job; lateral transfers; demotions; and voluntary separations for the seniority or experience of the groups of employees. Dr. White concluded that Dr. Moomaw reported only the racial composition of the workforce without regard to the advancement of black employees in the workforce. As to the TL pay type, the representation of blacks in that the leader group because persons were promoted out of that group into other pay types.

Dr. White admitted that his promotions analysis of MWS's black and white employees was based upon the total number of promotions over the five year period. Thus, when a black

MWS employee was promoted from a Clerk 1 to a Clerk 2, Dr. White counted that as a promotion and equivalent to a white MWS employee being promoted from assistant manager to a manager. Id. at 160. Dr. White did not consider qualifications in his analyses. As to compensation, Dr. White considered the salary type for and grouped all of the grades of SR into one category and calculated the number of promotions of African-Americans and whites MWS employees. As to pay, Dr. White's differentials were within a particular salary type and salary grade. Id. at 162. Thus, Dr. White compared a black employee in an SR-8 position to a white employee in an SR-8 position. For his comparison, Dr. White did not include any pay of a black MWS employee "if there could not be a comparison of their pay relative to a white employee." Id. at 163.

Dr. White, however, agreed with the overall measurement of promotions and compensation of black and white employees at MWS should be as follows:

> So you are asking yourself, what does all this mean. Recall at the beginning of my testimony that we were going to focus on what to expect from an employer where both the race groups are treated the same. Specifically, we said that for promotions, we expect that African; American percentage of people who are promoted is about the same as the African-American percentage in the workforce. For example, again, if African Americans make up 25 percent of the workforce, then we expect about 25 percent of those who are promoted to be African-American. For compensation, we expect that when we compare the average compensation levels of African-American to the average compensation levels of whites with similar experience, salary plan, pay grade, the compensation levels should be about the same.

(Docket Entry No. 207 at 145) (emphasis added). To be sure, as described above, Dr, White did not find any racial disparity in promotion rates or compensation levels of black and white employees at MWS.

In deciding the persuasiveness of these competing experts' statistical studies, the Court notes that Dr. White's analysis fails to consider the critical issue in this action, namely whether

MWS's cited practices have caused MWS's black employees to be concentrated in the lower level jobs and pay levels. In essence, Dr. White's analysis conducts a horizontal view of promotions in that Dr. White examines and counts promotions within each job grade. For example Dr. White considers a promotion from Clerk 1 to Clerk 2, to be a promotion and totals all such promotions for his conclusions about black and white promotions. Dr. White ignores the specifically higher concentration of white MSW employees in the upper level jobs at MWS and the significant underrepresented number of black MWS employees in those positions. Dr. White's comparison analysis is also statistically incomplete because Dr. White excuses from his statistical compilations, white employees who hold positions for which there is not any comparable black employee.

Citing Dr. White's report, Metro challenges Dr. Moomaw's analysis contending that Dr. Moomaw failed to control for causation and other business realities in his finding of a disparate impact adverse to black employees. Dr. Moomaw's analysis compared black employees and white employees at all pay grades, FLSA statuses, salary types, and EEO functions. This modeling found major disparities between black and white employees, with blacks largely concentrated in lower grade, lower paying, menial positions, while whites predominated in higher paying administrative and supervisory positions. In contrast, Dr. White's analysis claims that by examining individual job strata and controlling for other decision-making factors, blacks and whites were promoted at equal rates and no statistically significant racial disparity exists.

After reviewing the expert reports and expert testimony, the Court finds that Dr. Moomaw's analysis is more persuasive given the evidence present here and Sixth Circuit precedent regarding disparate impact analysis. Dr. White's analysis fails to compare overall disparities showing a lack of blacks promoted to upper level positions or higher pay grades.

47

Examining an overarching lack of blacks in higher level positions and pay grades is far more consistent with Sixth Circuit case law, discussed infra, than Dr. White's narrowed analysis.

Further, Dr. White's analysis relies on assumptions regarding qualified applicants and position qualifications that the evidence does not support. As noted, supra, the facts here establish that qualifications for open positions were often unclear or altered by MWS from the original job description to lower qualifications for white employees who were selected for promotions. Members of the Plaintiffs' class were often told that an open position for promotion had been preselected, and the Defendant's preselected candidate, in fact, did assume that position. As such, any alleged lack of controls for qualified applicants is unsupported and rejected. While necessarily imperfect given the facts here, a better comparison is that used by Dr. Moomaw, namely an analysis of blacks in higher level positions compared to the overall black to white ratio at MWS. Finally, on cross-examination, Dr. White essentially stipulated that overall promotion rates for blacks should mirror the black employee population as a whole.

#### 4. Business Necessity Proof

Among the ten pages of MWS's proposed findings of fact and conclusions of law on Plaintiffs' disparate impact claims (Docket Entry No. 219), MWS presents one sentence in one paragraph for the facts in support of its business necessity defense. MWS's single sentence only cites pages of the trial transcript and trial exhibits without any presentation or explanation or analysis of that proof. The Court, however, reviewed these conclusory references to the trial record for relevance.

Metro first cites portions of the testimony of Robin Brown, MWS's former human relations manager about Plaintiff Reid's concerns about lateral transfers of white employees. Reid, however, did not complain to Brown. (Docket Entry No. 208 at 25, 29). Brown described

48

the lateral transfers of Jim Pollus, Dee Dee Vogt, Harry Gilmore, Faye Smith, Anne Brown, Helen Andrews, Denny Bone and Christine Brinkley as due to layoffs on the closing of the Metro Thermal Plant or as temporary workers at MWS for lack of work within other Metro agencies or to secure eligibility requirements for retirement for Gilmore. Id. at 25-31.

Metro next cites a series of MCSC rules on "transfers," "voluntary reduction in grade" and "layoffs" without any analysis or attempt to apply those rules to the facts of this action. The cited Rules provide as follows:

### SECTION 3.9 – TRANSFERS

Employees may transfer into Civil Service departments according to the guidelines listed in this rule. All transfers must be reported to the Civil Service Commission.

A.  Same Class - A full-time Civil Service employee may transfer to another department in the same classification upon agreement by both Appointing Authorities without having his name placed on a transfer list.

B.  Lateral Class - A full-time Civil Service employee may be appointed to a lateral or lower classification in another department from a transfer list or eligibility register upon agreement by both Appointing Authorities. Voluntary Reassignment to a different lateral classification within the employee's department will be considered a lateral transfer and the class change will be reported as an appointment to the Human Resources Department and the Civil Service Commission

C.  Functional - A department may initiate the lateral transfer of employees when services or functions are moved from one Civil Service department to another.

D.  Metro-Wide - Employees who have Civil Service status under another Metro Civil Service Board (Board of Hospitals, Board of Health, or Board of Education) may transfer to a Civil Service Department as provided for in the "Transfer from Other Metro Systems" policy. They

may also receive a functional transfer provided they are Civil Service employees under their respective board."

E.     Promotion - A Civil Service employee may accept a promotion from an eligibility register with transfer to another department. If such an employee fails his work test, he will revert to his original classification and the two departments involved will attempt to place him in an appropriate position.

<u>Intra-Departmental</u> - Transfers within a department are considered as job assignments, as long as the employee remains in their classification and the work involved is similar in nature and requires similar skills and abilities. Intra-departmental transfers are at the discretion of the Appointing Authority, however, TLS non-exempt employees may bid on vacancies within their department if they already hold the classification that is vacant. Seniority will be the governing factor provided everything is equal. Employees whose request to transfer to fill a vacancy is denied, will be provided a reason if requested. Sworn members of the Police Department and Fire Department employees may not transfer during the probationary period.
NOTE: See Fire and Police Chapters

## SECTION 3.10 - VOLUNTARY REDUCTION IN GRADE

(See section 5.6 for information on setting pay).
A voluntary reduction in grade occurs when an employee requests assignment to a lower classification than his current one for which there is a vacancy and is subject to approval by the Appointing Authority and the Director of HR. The employee must meet the minimum qualifications if he is going to a different class series. A work test is not required but the employee must have a performance evaluation by the end of six months in the new position. If an employee subsequently wishes to return to the higher classification, he must compete in the promotional process.

(See Fire Chapter)

## SECTION 3.1 1- LAYOFF

An Appointing Authority, with the approval of the Human Resources Director, may effect layoff actions when necessary. A layoff action is defined as a termination of employment resulting from the lack of funds or work, abolishment of position(s), reorganization, or a rollback in classification, increment or salary. A rollback in classification is when an employee is moved to a lower classification in the class series based on seniority, or to a previously held classification. Layoff actions will be

determined on a departmental basis and do not create any employee rollback rights between departments.

Refer to Layoff Policy 3.1 1 for a detailed description of the process.

(Defendant's Trial Exhibit 100 at 28-29).

POLICY: 3.11
TITLE: LAYOFF POLICY

## General

An Appointing Authority, with the approval of the Human Resources Director, may effect layoff actions when necessary. A layoff action is defined as a termination of employment resulting from the lack of funds or work, abolishment of position(s), reorganization, or a rollback in classification, increment or salary. A rollback in classification is when an employee is moved to a lower classification in the class series based on seniority, or to previously held classification. (See Layoff Process Section B) Layoff actions will be determined on a departmental basis and do not create any employee rollback rights between departments.

## Layoff Process

A     The Appointing Authority determines the total dollar figure necessary for the department to operate within its budget allocation and determines the number of positions within each classification or class series that are affected. For a departmental reorganization, the Appointing Authority determine$ the number of positions to be reduced within each classification and class series.

B     A class series will be determined by agreement with the Appointing Authority and the Human Resources Director. In most cases, employees are in a class series that is comprised of positions that utilize similar knowledge, skills and abilities where the difference between the entry-level classification and the top-level classification is based on the amount of experience in the position. Employees in other class series may be in positions that share a generic job title, however, the class series is defined by the specific job function and requires different levels of knowledge, skills and abilities.

C     In determining layoffs or rollbacks, the continuous service date (seniority) will be the initial basis used to determine who will be affected within a particular classification and/or class series. If seniority between two employees is the same, then performance

evaluation, prior disciplinary action, special training and attendance since the last evaluation will be the deciding factors. Civil Service employees have the right to bump into non-Civil Service positions prior to being laid off. This may result in the layoff or rollback of an employee in a non-Civil Service status.

D      Beginning with the highest classification to be affected, the person or persons with the least amount of seniority shall be rolled back or laid off. An employee may be rolled to the classification immediately below in the class series (or lower if necessary according to seniority), or to a classification he previously held. In order for an employee to be rolled back, the following criteria must be met:

          1. The new position reflects duties to be performed; AND

          2. The employee has seniority equal to or greater than the employee he will bump out; AND

          3. The employee must have previously held the position; OR

          The employee must meet the minimum qualifications of the position and otherwise be able to perform the duties.

This action continues through all classifications affected.

E      A waiver of the seniority provision may be requested by the Appointing Authority, to retain an employee who is vital to the operation of the department. The request will be submitted to the Civil Service Commission for approval. The Appointing Authority must present facts which show that the employee has specialized training or skills in an area which is vital to the department, and that no other Civil Service employee in the department can adequately perform the work required by the position.

F      The Appointing Authority will submit a layoff plan to the Human Resources Director at least one month prior to the proposed effective date, unless the Human Resources Director waives the time period. Additional time may be required if Civil Service Commission action is needed. The Appointing Authority, or designee, must be available to review the plan with the Human Resources Director, or designee, to answer any questions and resolve any problems. Layoff plans must contain the following information:

          1.  A list of all employees in the department by classification and by class series     starting with the most senior employee and ending with the least senior

employee. For each employee the following1 must be indicated:
- Date of employment
- Adjusted date of employment
- Total length of service
- Current status

2. A list of all employees to be laid off or rolled back, including the proposed effective date.

3. Waiver justifications to be submitted to the Civil Service Commission.

G The Human Resources Director will notify the Appointing Authority, in writing, and the appropriate employee representative group, that the layoff plan has been approved. Approval of each layoff plan will be reported to the Civil Service Commission at their next meeting.

H The Appointing Authority shall immediately notify each affected employee, in writing, of the action to be taken and the effective date. Such notification must be given at least two weeks prior to the effective date, and also advise the employee that he may file an appeal of the layoff action with the Civil Service Commission, within fourteen (14) calendar days from the date of the letter. Appeals to the Civil Service Commission will not delay implementation of the layoff action. Deliberation by the Civil Service Commission shall only be to consider facts which would show that the rules and procedures were not properly followed. The burden will be on the employee to show any irregularity in the application of the policy.

I Any employee laid off under these procedures shall be entitled to be paid for any accrued vacation time that has been earned and to any compensatory time earned as provided under the Civil Service Rules. (See Section 5.13)

(Defendant's Trial Exhibit 100 at Policy 3.11).

Metro next cites Chapter 5 of the MCSC rules, most of which applies to special pay involving overtime, holiday pay and shift differential pay, none of which is at issue in this action. As to the section 5.9 on "Work in a Higher Classification" Section, that section provides as follows:

**Section 5.9 - WORKING IN A HIGHER CLASSIFICATION**

The policy for working in a higher classification is intended to provide departments some flexibility for immediate and short term staffing needs, not to circumvent the Civil Service promotional system. Employees working in a higher classification shall meet minimum requirements of the position and assignments must be to budgeted positions.

**Eligibility Provisions:**

- Employees must be assigned in advance by an authorized supervisor.

- The employee must perform at least 75% of the typical duties listed in the functional job description of the higher position.

- TLS non-exempt employees who work at least half of their assigned shift in an out of class position will receive out of class pay for the hours worked in the out of class position. All other employees must be physically present and perform those duties for at least 75% of the shift in order to receive out-of-class pay. No employees will be paid the out-of-class rate while off on leave or holidays unless approved by the Director of HR.

- Any person assigned to temporarily fill a vacant position on the Director Pay (DP) Schedule will not be eligible for out-of-class pay as provided for in this section and will not be subject to the provisions of Section 5.9. The rate will be established in accordance with Policy 5.6 A-I, Director Pay Schedule.

  Note: All exempt out-of-class assignments must be to budgeted positions that are vacant or the employee normally assigned to that position is on leave or working in a higher classification.

**When Pay Begins:**

  Classes in the TLS pay schedule: Employees will be eligible for out-of-class pay beginning on the first day the employee works in the higher classification.

  Classes in the SR. PS and CO pay schedule: Employees must perform the duties of the higher class for a minimum of 30 consecutive workdays to be eligible for the out-of-class pay. Once eligible, the employee shall receive the pay retroactive to the first day.

Certain Fire Department classes receive a flat rate per shift for out-of-class work and are paid as of the first day. After thirty consecutive days at the flat rate these employees will stop receiving the flat rate and will begin to be paid in accordance with this section. When this occurs the employees are not paid retroactively, since they have already received the flat rate.

**Procedures for out-of-class assignment beyond thirty (30) working days.**

1. The department making the assignment shall post in the department an announcement of the out-of-class position and the person selected.

2. The department making the assignment shall give written notice to the Director of HR which shall include the name of the person selected to serve in the out-of-class assignment and certification that such person meets the minimum requirements. If the position is vacant, the department shall also certify that the position cannot be filled on a permanent basis at that time.

3. If there is no register from which to fill the position, the Department of HR will announce an examination so the position may be filled on a permanent basis.

4. If there is no register and it is necessary to fill a position after thirty days with an employee who does not meet the minimum requirements (because there are no employees available who meets the minimum requirements), the department may request an extension of the thirty-day period from the Director of HR. If the extension is approved, the employee may continue working in the higher classification until such time as a register can be furnished the department, and a permanent selection made.

**Pay Provisions:**

**Maximum Time Limits:**

No out-of-class assignment may exceed 100 working days in a calendar year (exempt or non-exempt) without the review and approval of the Commission, except when the employee normally assigned to that position is on extended leave. In such cases the out-of-class assignment may continue until the leave expires.

(Defendant's Trial Exhibit 100 at 51-52).

Metro next cites certain testimony of Vernon Frye, member of MWS management, that a high school diploma or general equivalency diploma is necessary for the maintenance and repair leader 2 because the position requires the person to read and write. Yet, McKibbens who at one time had no high school diploma or general equivalency diploma, actually performed in that position on an out-of-class basis for years without complaints. Two prior white MWS employees held that position without a high school diploma.

Metro next cites Plaintiffs' Exhibit 102, a 2002 MWS job description for which the title is illegible, but refers to its job duties as an assistant to the Assistant director of MWS's operations. The only apparent noteworthy observation is that the "Exam Weights: 80% interview and 20% seniority." Id. For some positions, the interview is weighed as 100% of the promotion decision.

Metro next cites Brown's testimony about a defense exhibit describing the requirement of a high school diploma, but Brown did not have any personal knowledge about the revisions to that document. (Docket Entry No. 208 at 105-06). Metro next cites 18 pages of Brown's testimony without any analysis. As pertinent here, promotions "could be limited to a particular agency." (Docket Entry No. 209 at 201). If Metro agency heads agree, a lateral transfer between Metro agencies is permissible. Id. at 202. When an employee attains a particular job, future changes in that position, based upon time and grade in that position are not posted, but someone certifies the MWS employee's eligibility for a change in "grade." Id. at 203. MWS "would work with the Human Resource Department on the announcement" for promotions. Id. at 204. Yet, Brown's "responsibilities involve[] recruitment and benefits." Id. at 208.[7] In any event, Brown

---

[7] Brown who was MWS's principal witness at trial worked at MWS from 2002 to September 2005 actually lacked personal knowledge or involvement in Reid's application for the position awarded to Belcher (Docket Entry No. 208, at 14, 18) nor the Dooley interview for selection of the administrative service officer 4 promotion process. Id.

described the process on interviews of applicants for promotions, id. at 209, as well as MWS's

pay plan. Id. at 209-213. Within these pages, Brown also described MWS's bumping process,

id. at 214-15, but that is not an issue in this action. MCSC relies on MWS for job descriptions of

its technical jobs. Id. at 219. MWS could also inform Metro Human Relations that a degree

was not required for a position. Id. at 194. Within these cited pages, Brown testified that the job

description or the position given to Steven Belcher was changed in 2001. Id. at 215.

## B. CONCLUSIONS OF LAW

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e prohibits as

unlawful any employment practice where:

> the plaintiff employees demonstrate that the defendant employer uses a particular
> employment practice that causes a disparate impact on the basis of race, color or
> national origin and that respondent fails to demonstrate that the challenged
> practice is job related for the position in questions and consistent with business
> necessity;

> or

> the employer demonstrate that the employer could engage in an alternative
> employment practice that does not result in a disparate impact, but the employer
> refuses to adopt such alternative employment practice.

42 U.S.C. § 2000e-2(k)(1)(A) and (B).

Here, Plaintiffs rely upon the disparate impact theory under which an employer's facially

neutral practices that have an adverse impact on a protected group (here, MWS's black

employees) violate Title VII, absent proof of business necessity. Griggs v. Duke Power Co., 401

U.S. 424, 425-307 (1971) (disparate impact from requiring a high school diploma or testing

without a showing of business necessity violates Title VII). Proof of discriminatory intent is not

required under this theory. Id. at 432. This theory applies to employment practices based upon

---

at 16. Brown could not recall Reid's complaint about several promotion, id. at 17-18, nor in the selection of
McCullough, id. at 62, did not know how many times McKissack applied for promotions. Id. at 139.

objective and subjective criteria for employment decision. <u>Watson v. Fort Worth Bank and Trust</u>, 487 U.S. 977, 989-90 (1988). The disparate impact theory may be utilized for individual and class claims of discrimination. <u>Bacon v. Honda of America Mfg., Inc.</u>, 370 F.3d 565, 576 (6th Cir. 2004).

In this Title VII action, Plaintiffs' burden of proof is by a preponderance of the evidence. <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 802 (1973). The Supreme Court has devised a three-part burden-shifting test on whether an unlawful employment practice has had a disparate impact in a particular action. <u>See</u> <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 425 (1975). First, Plaintiffs must first identify an employment practice that produces a significant adverse impact on protected employees. "A prima face case is established when: (1) the plaintiff identifies a specific employment practice to be challenged; and (2) through relevant statistical analysis proves that the challenged practice has an adverse impact on a protected group. <u>Dunlap v. T.V.A.</u>, 519 F.3d 627, 629 (6th Cir. 2008)) citing <u>Johnson v. U.S. Dep't of Health and Human Servs.</u>, 30 F.3d 45, 48 (6th Cir.1994) (citing <u>Scales v. J.C. Bradford & Co.</u>, 925 F.2d 901, 907-08 (6th Cir.1991)).

Yet, by statute, "if the complaining party can demonstrate to the court that the elements of [the employer's] decision making process are not capable of separation for analysis, the decision making process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i). Moreover, if, as here, "the employee challenges the employer's promotion process as a whole…then the disparate impact and causation elements merge.'" <u>Phillips v. Gates</u>, 329 Fed. Appx. 577, 581 (6th Cir. 2009) (citations omitted).

First, as to the specific practice required by <u>Dunlap</u>, the Court finds that Plaintiffs' identification of MWS's practices of tailoring job qualifications for promotions, lateral transfers,

selective interview processes for promotions, out-of-class assignments and subjective decision-making standards for promotions and discriminatory compensation practices as causing the significant statistical disparities on its black employees, is established by a preponderance of the evidence. With class certification, the named Plaintiffs' experiences are representative and typical of their class members' experiences. According to Plaintiffs' proof, MWS's practice of tailoring job descriptions involves removing job requirements for higher positions to favor MWS's white employees. MWS's altered educational requirements for positions that have the actual effect of increasing the number of white employees promoted. Lateral transfers have the effect of denying MWS's black employees from promotions to higher level positions. MWS used selective oral interviews with open discussion of scoring among panel members, and the results of the oral interview represented from 50% to 80% or 100% of the selection decision, thus undermining the applicant's seniority and experience. See Dunlap, 519 F.3d at 63. In addition, MWS's misuse of out-of-class assignments resulted in the denial of promotions to black employees that were given to MWS's white employees. MWS also delayed higher compensation paid to black employees who worked six months to two years on an "out-of-class" basis. These black employees were not promoted as white MWS employees were and had to file grievances and objections to receive the higher pay required by the "out-of-class" policy for such work. The specific practices alone and in combination have had the effect of denying and delaying promotions to black employees at MWS, as set forth by Dr. Moomaw's testimony and analyses and Plaintiffs' other proof. See 42 U.S.C. § 2000e-2(k)(1)(B)(i); Phillips, 329 Fed. Appx. at 581.

MWS's compensation practice is another practice that adversely impacts MWS's black employees. This practice resulted in compensation levels of black employees who are also

concentrated in the lowest grade levels within the same pay ranges for white employees. The statistics also show that black employees at MWS are also concentrated in lower job classifications at lesser compensation levels. As established by the proof, widespread statistical imbalances among MWS's white and black employees remain with white employees in higher paying jobs.

Significant statistical differentials exist as to the promotion and compensation of MWS's black employees. For disparate impact claims, statistical proof "ha[s] served and will continue to serve an important role" for such claims. Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 620 (1974). Yet, the relevant analysis should not be "formed in terms of any rigid mathematical formula." Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 994-95 (1988). A plaintiff's failure to include "all measurable variables" does not preclude a plaintiff's recovery under this theory. Bazemore v. Friday, 478 U.S. 385, 400 (1986). "In cases involving promotion policies, the relevant inquiry is comparing the number of protected group members benefitting from promotions with the number seeking them; this figure is then contrasted with the corresponding ratio for the non-protected group." Phillips v. Cohen, 400 F.3d 388, 399 (6th Cir. 2005).

As to measures to evaluate statistical proof of disparate impact claims under Title VII, the Sixth Circuit adopted the standards in Castaneda v. Partida, 430 U.S. 482, 496-97 n. 17 (1977) and Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308-309 n. 14 (1977)) that involves "a calculation of the 'standard deviation'[8] as a measure of predicted fluctuations from the expected

---

[8] The Sixth Circuit provided a practical example of the calculation of the standard deviation from statistical proof on a disparate impact claims based upon promotion decisions.

> To determine whether it can be inferred that race played a role in the City's promoting policies, a statistical test-the binomial approximation model-approved in many cases. . . Under this model, which involves "a calculation of the 'standard deviation' as a measure of predicted fluctuations

value of a sample. . .A 'difference between the expected value and the observed number [that] is greater than two or three standard deviations,'" would allow an inference that race had played a role in MWS's promotion policies. Vogel v. City of Cincinnati, 959 F.2d 594, 600 (6th Cir. 1992).

Plaintiffs' proof of a significant disparate impact is that black employees at MWS are adversely impacted in promotions to higher positions in MWS's management and such disparate impact is reflected in the disproportionate numbers of blacks in such positions. Historically MWS's management has been overwhelming white and Plaintiffs' expert's statistical analysis of MWS's workforce shows that continues. The statistical data in Dr. Moomaw's supplemental report examined MWS's FLSA exempt versus non-exempt employees. In determining whether there was evidence of discrimination in the promotion of blacks at MWS, the expected number of FLSA exempt employees should mirror the percentage of black non-exempt employees,

---

from the expected value of a sample ... [a] 'difference between the expected value and the observed number [that] is greater than two or three standard deviations,' " would allow an inference that race had played a role in the City's [promoting] policies.

Id. (citations omitted).Using this model, we find that the numbers in this case also reveal a statistical disparity substantially in excess of two or three standard deviations. This finding is based on a comparison of the percentage of blacks who are Sergeants with the percentage of blacks who are patrol officers that are eligible to become Sergeants.

In determining whether there was evidence of discrimination in the promotion of blacks in the City's Police Department, the expected number of Sergeants should mirror the percentage of black patrol officers. Therefore, in 1978, the expected number of Sergeants is fifty-eight (23% x 254 = 58). The actual number of black Sergeants is nineteen. The difference between the expected number of black Sergeants and the actual number of black Sergeants is thirty-nine.

The measure of the predicted fluctuations from the expected value is the standard deviation, defined for the binomial distribution as the square root of the product of the total number in the sample (254 Sergeants) times the probability of promoting a black (.23) times the probability of promoting a non-black (.77). See Castaneda, 430 U.S. at 496-97 n. 17, 97 S.Ct. at 1281 n. 17. In this case, the standard deviation is approximately 6.7. To derive the disparity expressed in terms of standard deviations in our case, then, we divide thirty-nine by 6.7, to obtain a disparity of approximately -5.8 standard deviations. Since 5.8 standard deviations markedly surpasses the rough limit of two or three standard deviations approved in Vogel, we hold that evidence of prior discrimination exists.

Aiken v. City of Memphis, 9 F.3d 461, 468 n.10 (6th Cir. 1993) (emphasis added) superseded on other grounds 37 F.3d 1155 (6th Cir. 1994) (en banc).

approximately twenty-eight percent. In 2000, the expected number of black FLSA exempt employees is twenty-six (27.504% x 95 = 26).[9] The actual number of black FLSA exempt employees is ten. The difference between the expected number of black FLSA exempt employees and the actual number of black FLSA exempt employees is sixteen.

Under Castaneda, the measure of the predicted fluctuations from the expected value is the standard deviation, defined as the square root of the product of the total number in the 2000 sample (95 FLSA exempt employees) times the probability of promoting a black employee (.27504) times the probability of promoting a non-black (.72496). 430 U.S. at 496-97 n. 17. Here, the standard deviation is approximately 4.35. By dividing the difference between the actual and expected black FLSA exempt employees by this standard deviation, the Court finds that the actual number of black FLSA employees is approximately 3.68 standard deviations below the expected value. Because 3.68 standard deviations markedly surpasses the rough limit of two or three standard deviations approved in Vogel, the Court finds evidence of prior discrimination for 2000.

Performing this analysis for all years from 2000-2006, the Court also finds substantial evidence of prior discrimination. The Court performed the above calculation for every year from 2000-2006. In the interests of brevity, the equations are not listed here, but the Court found that the actual number of black FLSA exempt employees fell below the expected value by more than three standard deviations every year. The standard deviation values determined by the Court for Black FLSA exempt employees are as follows: 2000 – 3.68; 2001 – 4.27; 2002 – 4.16; 2003 – 3.99; 2004 – 3.81; 2005 – 3.24; 2006 – 3.16.

---

[9] The raw data used for the binomial distribution statistical analysis is from Dr. Moomaw's 2007 supplemental report that utilized updated data provided by MWS.

As to pay grade distribution, the Court performed a similar standard deviation calculation based on the pay grade distribution of black and white employees within each Salary Type. Within each salary type, employees were divided into higher and lower earning groups, and then the analysis was applied. For the SR Salary Type, the higher group was defined as Pay Grade 10-15, and the lower group was Pay Grade 3-9. For the TG Salary Type, the higher group was defined as Pay Grade 8-13, and the lower group was Pay Grade 2-7. For the TL Salary Type, the higher group as defined as Pay Grade, 10-14, and the lower group was Pay Grade 3-9. For the TS Salary Type, the higher group was defined as Pay Grade 11-13, and the lower group was Pay Grade 11-13.[10]

Applying this analysis, the Court finds statistically significant deviations from the expected numbers of black employees paid in the higher group for the SR, TG, and TL Salary Types. The standard deviations determined by the Court were as follows (all values indicate deviations below the expected number of black employees unless otherwise noted):

- SR Salary Type: 2000 – 2.19; 2001 – 3.65; 2002 – 4.34; 2003 – 4.31; 2004 – 5.00; 2005 – 5.41; 2006 – 4.35.

- TG Salary Type: 2000 – 4.00; 2001 – 5.70; 2002 – 4.18; 2003 – 4.68; 2004 – 5.55; 2005 – 5.63; 2006 – 5.93.

- TL Salary Type: 2000 – 4.48; 2001 – 4.36; 2002 4.24; 2003 – 4.43; 2004 – 3.54; 2005 – 4.20; 2006 – 4.40.

- TS Salary Type: 2000 – 0.70; 2001 – 0.68; 2002 – 2.67; 2003 – +0.46 (+ indicates more black employees in the higher pay group than statistically expected); 2004 – +4.65; 2005 – +2.22; 2006 - +1.82.

The TS Salary Type deviations varied greatly and largely were not statistically significant, but as Dr. Moomaw explained this is likely due to the small sample sizes for each

---

[10] The Court could not perform this binomial distribution analysis on EEO status or salary type as these categorizations are multi-variable and cannot be divided easily into two discreet categories for comparison and analysis as required for the formula described in Vogel.

year (all but one sample was 25 or below). Using this data for the standard deviation calculation, the Court finds a statistical disparity substantially in excess of two or three standard deviations across nearly all FLSA and pay grade classifications for all years from 2000-2006. This finding is based on a comparison of the percentage of blacks who are classified as FLSA non-exempt with the percentage of blacks who are FLSA non-exempt. As such, the data on compensation of black and white employees at MWS overwhelmingly supports a finding under <u>Vogel</u> that evidence of prior discrimination exists. The Court concludes that under <u>Vogel</u>, given the consistent racial skew of more than 2 standard deviations in MWS's upper management and pay grades, MWS's promotion and compensation practices are the causes of these racial disparities in MWS's workforce.

In its challenges to these statistical disparities, MWS cites the necessity for Dr. Moomaw's failure to consider each applicant's qualifications and experience in MWS's promotion decisions. Yet, as a matter of law, in <u>Phillips</u>, the Sixth Circuit noted on the issue of the qualifications of applicants for promotions that the following:

> Second, cases concerning promotions appear reticent to apply the <u>Wards Cove</u> requirement of using qualified persons as the benchmark for the disparate impact analysis. In <u>Teal</u>, the Court examined whether a threshold test administered to employees who wished to become supervisors had a discriminatory effect. 457 U.S. at 444, 102 S.Ct. 2525. <u>Disparate impact was determined by what percentage of each ethnic group passed the test; the Court did not find it necessary to control for factors such as the employee's professional experience. Id.</u> Similarly, <u>Scales</u>, 925 F.2d 901 (6th Cir. 1991), a case from <u>this Circuit, found gender discrimination on the basis of evidence that it took women longer than men to be promoted to the first managerial level in the company. Scales</u>, 925 F.2d at 906. The district court had found the data legally insufficient, because they failed to screen out factors other than gender. This court reversed, noting, "The Supreme Court has rejected rigid mathematical formulas in analyzing statistics purporting to show disparate impact .... the 'entire evidence' in the record must be considered in determining whether a claim for discrimination has been proven." <u>Id.</u> at 908 (quoting <u>Bazemore v. Friday</u>, 478 U.S. 385, 404, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)). The Ninth and Second Circuits, further, conclude that <u>the proper inquiry in promotion cases is "the composition of candidates seeking promotion and the</u>

> composition of those actually promoted," without reference to the candidates'
> qualifications. Stout v. Potter, 276 F.3d 1118, 1123 (9th Cir. 2002); see Waisome
> v. Port Auth., 948 F.2d 1370, 1372 (2d Cir.1991).

400 F.3d at 400 (emphasis added). As a factual matter, the proof also clearly establishes that

MWS distorts educational requirements, seniority, and experience in its promotion decisions of

its white employees.

Metro relies on Wards Cove Packing Co. v. Antonio, 490 U.S. 642 (1989) to argue that

Plaintiffs' statistical proof shows only a racially imbalanced work force that does not prove

racially disparate impact under Title VII. Yet, Congress modified Wards Cove in the Civil

Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991), inter alia, as to the necessity of

proving a specific employment practice as causing such imbalances. See Smith v. City of

Jackson, 544 U.S. 228, 240-241 (2005). Congress amended Title VII to permit recovery where a

specific practice could be discerned, or the employer's conduct as a whole caused such

disparities in the employer's workforce as reflected supra, at pp. 60-63. Plaintiffs have satisfied

the Wards Cove standard. Here, Plaintiffs' proof identifies specific promotion and compensation

practices that cause the statistically significant adverse impacts on MWS's black employees, as

required by Wards Cove. 490 U.S. at 653. Moreover, MWS's expert agreed that MWS's work

force should reflect promotions and compensation levels of MWS's black employees comparable

to MWS's overall black workforce. MWS does not meet that standard with high levels of

MWS's black employees concentrated at lower pay grades and job levels.

Although MWS argues that lowering educational requirements increases the prospects for

black employee applicants, Dr. Moomaw explained that if this were true, then the practice would

yield a "favorable result of the same percentage of black employees throughout its management

ranks instead of their concentration at lower levels of employment." MWS's data does not show such favorable results for its black employees.

## MWS's Business Necessity

The statutory basis for this defense is as follows: "An unlawful employment practice based on disparate impact is established ... only if-[the] complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of ... sex ... and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity[.]" 42 U.S.C. § 2000e-2(k)(1)(A).

In Griggs, the Supreme Court held that for this defense, "[i]f an employment practice ... cannot be shown to be related to job performance, the practice is prohibited," id., and that the employer must prove a "demonstrable relationship to successful performance of the jobs for which [the practice or procedure] was used." Id. at 432-34. Moreover, "any given requirement must have a manifest relationship to the employment in question." Id. at 436. Later, Wards Cove redefined the business necessity defense to require only a showing of any "business justification" for the challenged business practice to defeat the disparate impact proof. 490 U.S. at 659-60. In the Civil Rights Act of 1991, § 3(2) and 105(b), Pub. L. No. 102-166, 105 Stat. 1071 (1991), Congress abrogated the Wards Cove definition of business necessity and reinstated the Griggs standards. See also 137 Cong. Rec. S15, 273-01 (daily ed. Oct. 25, 1991) (statement of Sen. Danforth) (adopting the Griggs definition of business necessity).

After Griggs, in Albemarle Paper Co. v. Moody, 422 U.S. 405, 432 (1975), where the employer's hiring decisions were based on its supervisors' subjective opinions, an employer's validation study that "involved no analysis of the attributes of, or the particular skills needed in, the studied job groups" failed to meet this business necessity defense. In Dothard v. Rawlinson,

433 U.S. 321, 332 n. 14 (1977), the Supreme Court noted that for the business necessity defense, the discriminatory practice "must be necessary for safety or efficient job performance" (quoting Griggs). In Bradley v. Pizzaco of Nebraska, Inc., 7 F.3d 795, 798 (8th Cir. 1993), the Eighth Circuit described the Griggs standard and the 1991 Act as "a heavy one" for which the employer "must also show a "compelling need ... to maintain that practice...."

As to MWS's business necessity defense, MWS's proposed factual findings for this defense is one sentence that references excerpts of trial testimony and certain exhibits without explanation or analyses of how these references meet the business necessity standard of a manifest need for proper job performance. The Court reviewed the content of those citations and set forth the obvious relevant portions thereof, supra at pp. 48-56. MWS's practice of altering prior job requirements to lessen education and experience requirements is not shown as a manifest need for proper performance of the jobs at issue. There was not any proof that the lateral transfer policy was necessary for proper performance of any of those jobs. Some of the cited lateral transfers were not shown as bearing a manifest tie to proper job performance. MWS's layoff and bumping policies, however, do satisfy this defense as reflecting the need to retain more experienced workers. In sum, except for its layoff and bumping policies, MWS's proof does not meet the legal standard Congress set for this defense, given the stark disparate impact of these practices.

### Individual and Class Remedies

Plaintiffs seek relief for themselves and an order requiring MWS to implement programs to remedy in a non-discriminatory manner MWS's procedures that have significant disparate effects on the compensation and promotion of its black employees. Plaintiffs request the

appointment of a task force to ensure the effectiveness of those remedies and an order restoring

Plaintiffs and class members to jobs they applied for and adjusting the wage rates to remedy

MWS's discriminatory compensation practices.

Upon a finding of discrimination prohibited by Title VII, Section 706(g) of Title

VII authorizes the district court to "order such affirmative action as may be appropriate,

which may include, but is not limited to, reinstatement or hiring of employees, with or

without back pay . . . or any other equitable relief as the court deems appropriate." 42

U.S.C. § 2000e-5(g) (1976).  As amended in 1972, Section 706(g) provides that "[b]ack

pay liability shall not accrue from a date more than two years prior to the filing of a

charge with the [Equal Employment Opportunity] Commission." 42 U.S.C. § 2000e-5(g).

In International Brotherhood of Teamsters v. United States, et al., 431 U.S. 324

(1977), the Supreme Court addressed this remedial statute's purposes:

> [A] primary objective of Title VII is prophylactic: to achieve equal employment
> opportunity and to remove the barriers that have operated to favor white male
> employees over other employees. ...The prospect of retroactive relief for victims
> of discrimination serves this purpose by providing the " 'spur or catalyst which
> causes employers and unions to self-examine and to self-evaluate their
> employment practices and to endeavor to eliminate, so far as possible, the last
> vestiges' " of their discriminatory practices. . . . An equally important purpose of
> the Act is "to make persons whole for injuries suffered on account of unlawful
> employment discrimination." Id. at 418.

> [T]he Court has held that the purpose of Congress in vesting broad equitable
> powers in Title VII courts was "to make possible the 'fashion(ing) (of) the most
> complete relief possible,' " and that the district courts have "'not merely the
> power but the duty to render a decree which will so far as possible eliminate the
> discriminatory effects of the past as well as bar like discrimination in the future.'"
> Albemarle, supra, 422 U.S., at 421. . . [U]nless there exist reasons for denying
> relief "'which, if applied generally, would not frustrate the central statutory
> purposes of eradicating discrimination . . . and making persons whole for injuries
> suffered.'" 424 U.S., at 771.

> The effects of and the injuries suffered from discriminatory employment practices
> are not always confined to those who were expressly denied a requested

employment opportunity. A consistently enforced discriminatory policy can
surely deter job applications from those who are aware of it and are unwilling to
subject themselves to the humiliation of explicit and certain rejection.

Id. at 364, 365.

In Segar v. Smith, 738 F.2d 1249 (D.C. Cir. 1984), the District of Columbia Circuit cited

the Congressional purpose of Section 706(g):

> The Conference Report accompanying amendment of Title VII in 1972 noted:
>
> The provisions of this subsection are intended to give the courts wide discretion
> exercising their equitable powers to fashion the most complete relief possible. In
> dealing with the present section 706(g) the courts have stressed that the scope of
> relief under that section of the Act is intended to make the victims of unlawful
> discrimination whole, and that the attainment of this objective rests not only upon
> the elimination of the particular unlawful employment practice complained of, but
> also requires that the consequences and effects of the unlawful employment
> practice be, so far as possible, restored to a position where they would have been
> were it not for the unlawful discrimination. This broad reading of the need for
> effective remedies * * * is intended to be preserved in this bill * * *.
>
> Section-by-Section Analysis of H.R. 1746, accompanying the Equal Employment
> Opportunity Act of 1972-Conference Report, 118 Cong.Rec. 7166, 7168 (1972).

Id. at 1289. Segar was cited approvingly by the Sixth Circuit, inter alia. In Bender v. Hetch

Dept. Stores, 455 F.3d 612, 621 (6th Cir. 2006).

For remedies for the named Plaintiff Grant, there are not any current upper management

positions identified as open. Although the selection of the current Assistant Director in the

Stormwater Division was a noncompetitive selection, Palko has served in that position for years

and would have an undue advantage, if the promotion process for that position were reopen.

Yet, Plaintiff Grant shall be awarded as backpay the amount that he would have received if had

been selected for one of the positions Potter and Palko identified for him in the AMEC report.

The backpay would be the amount of any such position that had a salary level higher than

Grant's salary level in 2002 and from the date of Grant's EEOC charge to the date of the Order filed herewith.

Plaintiffs McKibbens and McKissack shall be awarded backpay of the amount of the salary of the maintenance and repair leader 2 position from the date of their first applications for that position since 2002 to the date of the Order filed herewith. Plaintiff Tucker shall be given backpay for the promotion awarded to Christine Brinkley from the day of that promotion decision to the date of the Order accompanying this Memorandum. Plaintiff Derrick is awarded backpay from the date of the Ragland and Ward promotions to present given the Defendant's elimination of bachelor degree requirement in the promotion decisions. Plaintiff Reid is awarded backpay from the date of the promotion of the administrative service officers 3 position where the bachelor degree job requirement was eliminated and the white employee selected lacked a bachelor's degree. Plaintiffs Gant and Martindale shall receive a backpay award based upon the Special Master's formula from the date of their last promotion applications since 2002.

Plaintiff Day, who filed for bankruptcy and did not list her claims in this action as an asset of her estate in that proceeding and is barred under Lewis v. Weyerhaeuser Co., 141 Fed. Appx. 420 (6th Cir. 2005), from any award of relief.

Where backpay is awarded, in United States v. Warren, Mich., 138 F.3d 1083 (6th Cir. 1988), the Sixth Circuit addressed the award of prejudgment interest:

> Prejudgment interest is usually appropriate to make a discrimination plaintiff whole. An award of prejudgment interest "is an element of complete compensation" in a Title VII back pay award. . . . We commonly award prejudgment interest on back pay awards. . . . victims of discrimination should not be penalized for delays in the judicial process, and discriminating employers should not benefit from such delays. . . . The purpose of awarding prejudgment interest under Title VII, however, is to compensate victims both for the time value of the lost money as well as for the effects of inflation.

Id. at 18, 20 (citations omitted). The Court awards prejudgment interest for these backpay awards from the date of each Plaintiff's first backpay to the present as well as for qualifying class members.

As to the appropriate remedies for class members, the Court will appoint as a Special Master, an employment consultant or consulting firm, to validate the job requirements for positions at MWS. The appointment is necessary to address MWS's manipulation of its job qualifications that has caused a substantial statistically disproportionate impact on its black employees. The Special Master will also develop appropriate job related written questions for oral interviews for MWS's promotions, including for lateral transfers for positions in which a qualified black MWS employee could apply and recommend an appropriate ratio for scoring the oral interview in the selection process to avoid MWS's use of wholly subjective criteria for promotions. For one year, members of the MCSC or its designees shall serve as members of the oral interview team for MWS promotions, but may not include any MWS employees. MWS may designate a proctor to attend the interview. Utilizing Dr. Moomaw's analyses, the Special Master shall also hold hearings and determine a formula to award backpay to qualified class members who were denied promotions for positions for which they applied and white employee was selected, except in the TS salary group. The Special Master shall also prepare a formula to equalize MWS's black employees' compensation that is now below the grade level of comparable white employees, except for those employees in the TS salary group. This formula shall be utilized for awards of backpay to class members subjected to MWS's racially discriminatory promotion and compensation practices.

An appropriate Order is filed herewith.

**ENTERED** this the 27ᵗʰ day of July, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge